ALEXANDER McCONNELL *v.* SIMON KENTON.

*In Chancery.*

Simon Kenton, on the 20th day of December, 1779, obtained from the commissioners the following certificate, to-wit:

"Simon Kenton this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, lying on Elkhorn, joining Col. Preston's survey at the Cave spring, on the south-west side, by improving the same and residing in the country ever since the year 1775. Satisfactory proof being made to the court, they are of opinion that the said Butler[1] has a right to a settlement of 400 acres of land, including the said improvement, and the pre-emption of 1,000 acres adjoining, and that a certificate issue accordingly."

And on the 3d day of February, in the year 1780, he entered his certificate with the county surveyor in the following words, to-wit:

"Simon Kenton enters 400 acres by certificate, lying on Elkhorn, in the corner between Col. Preston's survey at the Cave spring and Douglass' line."

And having obtained a pre-emption warrant, and entered the same, and complied with the rules and regulations prescribed by law, obtained a patent for both settlement and pre-emption.

Alexander McConnell having, on the 3d day of January, in the year 1780, as heir-at-law of Francis McConnell, deceased, obtained the following certificate, to-wit:

"Alexander McConnell, heir-at-law to Francis McConnell, deceased, this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, lying on the waters of the south fork of Elkhorn, waters of Kentucky; to include the said decedent's improvement; by the said decedent's raising a crop of corn in the country in the year 1776. Satisfactory proof being made to the court, they are of opinion that the said McConnell has a right to a settlement of 400 acres of land, to in-

---

[1] Kenton had at first been known in Kentucky by the name of Butler.

17

clude the said improvement, and the pre-emption of 1,000 acres adjoining, and that a certificate issue accordingly."

On the 3d day of February, in the year 1780, entered his said certificate with the county surveyor, in the following words, to-wit:

"Alexander McConnell, heir-at-law to Francis McConnell, deceased, enters 400 acres in Kentucky, by virtue of a certificate, etc., lying on the waters of the South fork of Elkhorn, to include the said deceased's improvement."

And having surveyed the said 400 acres, so as to interfere with the settlement of the said Simon Kenton, obtained a patent of elder date than that of the said Kenton, and sold and conveyed part of the land to Francis Keene.

This suit was brought in the supreme court for the district of Kentucky, and on the erection of the district into the State of Kentucky, was removed to the court of appeals; and although brought in the name of Kenton, was brought for the use of Joseph Frazier, to whom he had sold.

The annexed connected plat, No. 35, was returned in this cause, of which the following is an explanation:

No 35

McConnell v. Kenton.

A B C D, Kenton's settlement as surveyed. A F G H, McConnell's settlement as surveyed. E, shown by McConnell as a corner of his settlement, but no corner found. a b c d, Kenton's settlement, by direction of the defendant. 9 10 11 12, McConnell's settlement, by direction of the complainant, including the pond in the center. The dotted lines, and from 4 to E, part of McConnell's pre-emption, according to survey. 1, the Blue spring. 2, Lyon's spring. 3, Francis Keene's spring. c to A and A to 7 8, part of Preston's military survey. 4 to 5, a line of Ward's military survey, surveyed by Douglass. 4 to G, a line of Mary Frazier's military survey.

The following is the pre-emption entry of the defendant, to-wit:

April 29, 1780. "Alexander McConnell, heir-at-law to Francis McConnell, enters 1,000 acres of land upon a pre-emption warrant, bounded by his settlement on the west, Douglass' line on the south, and John Maxwell on the east, to include the quantity."

It was in proof in the cause, that Kenton had improved at Lyon's spring, and had purchased that and the Blue spring.

And that Francis McConnell built a cabin, in the year 1776, at the pond, and that Alexander McConnell, the defendant, had chosen that improvement to lay the claim in for before the commissioners; and that the discovery that the pond was in a military survey, was not made until after the certificate had been obtained. It was also proved that the defendant Keene, before he completed his purchase, had notice of the complainant's claim.

This cause was first argued in the court of appeals at the October term, in the year 1793.

HUGHES for the complainant.—It is not material whether the certificate granted to the complainant is for an actual settlement, or a village right; if only for the last, it is elder than the defendant McConnell's, and his being a village right also, it is superior to his; for such claims can only take date from the location.

By the decision of the late supreme court for the district of Kentucky, in the case of Consilla v. Briscoe, the certificate of the commissioners and the entry with the surveyor are to be taken together.

Using this rule of construction, the complainant's location will read thus:

" On Elkhorn to adjoin Col. Preston's survey at the Cave spring,

on the south-west side, in the corner between Preston's survey and Douglas's line, to include his improvement."

*First.* Call on Elkhorn. It is on the waters of Elkhorn, but although this call might be uncertain by itself, it is sufficiently explained by the second call, to-wit: to adjoin Preston's survey on the south-west side, which it does.. The third call is to lie on the corner, between Preston's survey and Douglass' line; Ward's military survey was made by Douglass, and the line marked on the plat as Ward's, was known by the name of Douglass' line; and the defendant McConnell calls for it in his pre-emption by that name. It appears that Douglass' line and Preston's do not join or intersect, and therefore strictly speaking they form no corner, but Kenton must have supposed they did, and this call can certainly be only construed to mean that the complainant's settlement should be run along Preston's military line south-eastwardly to the end, where the corners would have been, if the two lines had intersected. He could not have intended to run further to the south-east, for he calls to lie on the south-west side of Preston; and because the last call is to include his improvement. This is Lyon's spring, and although the certificate shall be considered only as having granted a village right, still this is a material object of description.

The defendant's certificate is like the complainant's, for a village right, and was granted after the complainant's. It is therefore inferior. Besides it was not granted for the land now in contest; the Pond spring being the improvement it calls to include. The defendant Keene, if the purchaser of one claim without notice of a distinct and independent claim to the same spot, could shelter himself by the want of notice, can not in this case be protected, for notice of Kenton's claim is proved before he completed his title.

NICHOLAS for the defendant.—I will consider this case:

*First.* Upon the merits of the two claims.

*Second.* As far as the defendant Keene is interested in the dispute.

*First.* Upon the merits of the two claims.

Kenton obtained a certificate for a settlement and pre-emption, lying on Elkhorn, joining Preston's survey, at the Cave spring, on the south-west side, by improving the same and residing in the country ever since the year 1775; has a right to a settlement of 400 acres, including the said improvement, and a pre-emption of 1,000 acres adjoining.

McConnell *v.* Kenton.

I will consider:

*First.* The foundation of the claim.

*Second.* The location of it. And ·

*Third.* The manner in which it has been surveyed.

*First.* The foundation of the claim. How far it is inquirable into.

The commissioners acted in a double capacity, as judges and as agents for the commonwealth.

In granting certificates to the prejudice of others, they acted as a court; and so far may their proceedings be inquired to.

In granting lands to which no other person had a right, they acted as agents for the commonwealth, and in this case their certificate must be final, for the commonwealth by receiving the consideration has confirmed their acts.

As a court, the commissioners were a court of limited and special jurisdiction, and the powers of such courts shall be construed strictly. 3 Black. Com. 85; 2 Ins. 584; 1 Ves. 471; 1 Morg. Ess. 174; 1 Durnf. 776; 1 Black. Rep. 25; Cowp. 29.

A special authority must be strictly pursued, and appear to be so on the face of the proceedings. 1 Stra. 8, 26; 1 Durnf. 151; Cowp. 29.

Although the certificate of the commissioners may be conclusive evidence as to what was within their jurisdiction, yet it is not so as to what was not within their jurisdiction. 1 Morg. Ess. 174; 2 Durnf. 209; Amb. 164, 294; Hard. Ca. 186-7; Burr, 23, 28; Bull N. P. 173; 1 Esp. 284.

Although by the constitution of a court, their decisions are final, yet if they exceed their jurisdiction, their determinations may be set aside. 2 Black. 1331-2; 2 Wils. 384-5; Burr, 1044, 1458, 1460; Gilb. Rep. 247.

It appears by the act of assembly of 1784, p. 23, which is a declaratory act, that it was the intention of the legislature that the courts should inquire into the legality of certificates.

Kenton's certificate is granted him for improving the land, and residing in the country ever since 1775.

No settlements and pre-emptions could be legally granted for improving. land; they were given by law for different services, and the act, in a subsequent clause, takes up the subject of improvements, and gives the person making such improvement a right to a pre-emption only.

The improving the land, then, being no legal foundation for a

claim to a settlement and pre-emption, that part of the certificate may be laid out of the question.

"Residing in the country ever since 1775," the law after having declared that settlers should be entitled to a settlement and pre-emption, supposing that the description which had been given of those who were to be considered as settlers was too vague, it adds: "and to prevent doubts concerning settlements, it is hereby declared that no family shall be entitled to the allowance granted to settlers by this act, unless they have made a crop of corn in the country, or resided there at least one year since the time of their settlement." This being the parliamentary exposition, the court is bound by it, and can not give a different one. 3 P. Wms. 491; 2 Burr, 1151, 2104; 2 Black. Rep. 717, 718; Salk. 534.

So that unless a man had raised corn in the country, he must have made a settlement in it, and resided in the country one year since that settlement. But nothing of this appears from the certificate; it is only "for residing in the country ever since 1775," as residing without settlement preceding it, could not give a right to a settlement and pre-emption, this certificate was given without legal authority, and is therefore void.

There is but one possible construction which can make the certificate good, that is "by improving the same," was meant a settlement made by Kenton on this land. But this construction will be in the teeth of the words of the law; because the law clearly distinguishes between improvements made by improvers, and settlements made by settlers, and gives a greater proportion of land to the one than to the other.

To say, therefore, that when a man improved land, he shall be considered as having made a settlement; and that a person for improving shall be entitled to the reward given only to those making settlements, is doing away the distinction established by law, and confounding together those things which it meant to be kept separate and distinct.

If I am right, then, in this construction of law, the commissioners in granting a certificate for a settlement and pre-emption, for residing in the country ever since 1775, exceeded their authority, and having done so their certificate is void, and could give Kenton no right.

But supposing the court can support the certificate, by construing the words "by improving the same," to mean a settlement made by Kenton on the land, it must follow as a necessary conse-

quence, that this settlement must have been made by him on the land claimed by him more than one year prior to the granting his certificate, which was granted on the 20th of December, 1779; because the law says: " or resided there at least one year since the time of their settlement;" the certificate then with this construction, will amount to this: that Kenton's claim was put in and allowed, for his having made a settlement on the land claimed by him, and his having resided in the country twelve months since that settlement, and that his settlement of 400 acres was to include the settlement so made by him; whereas it appears by the evidence that he made no improvement there till the last of December, 1779.

*Secondly.* The location of Kenton's right.

*First.* With the commissioners " laying on Elkhorn ;" this would carry us to the main creek, and not to one of its forks; the distinction was then known as well as now, as appears by Frazier's pre-emption entry, McConnell's certificate and settlement entry, all of which call for the South fork of Elkhorn; therefore this call contradicts his survey.

" Joining Preston's survey at the Cave spring on the south-west side ;" this gives the claim some degree of specialty, as it fixes the side of Preston's survey on which it was to lie. But as Preston's line is 490 poles long, it is altogether uncertain on what part of it Kenton's claim was laid, therefore any person who located a subsequent claim, had a right to locate any part of Preston's line; provided they left Kenton as much of it as would let him have his survey in a reasonable form; this McConnell has done fully; because it is from the corner of his settlement to Preston's north-west corner 282 poles. Whereas 253 poles in that line would have been sufficient to give Kenton his 400 acres in a square, which would be the most disadvantageous form it could be placed in for McConnell; and this would have placed both of his improvements nearer the center of his claim than they stand now.

This principle has already been established and acted upon in the cases of pre-emptions, which call generally to adjoin settlements.

And McConnell having surveyed first, and Kenton having notice of his survey before he made his own, he was bound to take notice of it in making his survey, as his own entry was vague, and ground enough was left for him.

Therefore from this call (which from the proof will appear to

be the only special one) Kenton has no right to complain of the manner in which McConnell has surveyed, or to take one foot of the land included in his settlement.

"Has a right to a settlement of 400 acres, including said improvement." This evidently means to include the improvement made by Kenton on the land, for the making of which his certificate was granted to him.

To make this call for Kenton's improvement have any effect on his claim against McConnell, he must come forward with full and sufficient proof of an improvement made by him on the land which he now claims, at least one year prior to the date of his certificate.

The bill does not state that he has included any such improvement. No proof is brought that he has included any such improvement; therefore as his certificate was illegal except it was given to him in consequence of a settlement made on this land, and as it was necessary for him to show an improvement made by him on this land, to prove that it was the spot granted him by the commissioners, the entire want of such proof must destroy his claim.

To this it may be said, that it appears from the evidence that he had purchased two springs and one improvement from William McConnell, the one at the Blue spring, the other at Lyon's spring, before he obtained his certificate. Two replies may be made to this. *First*, That the purchasing an improvement and residing in the country since 1775, would not give a right to a certificate for a settlement and pre-emption. *Secondly*, That if it would have been sufficient for the commissioners to grant such a certificate it is improper evidence in this case; because the certificate does not state that it was granted on such foundation, but for Kenton's improving the lands; and because the bill does not state any such purchase, but only refers to the certificate; therefore his claim by purchase not being put in issue or made any part of his case, no testimony can be admitted to show such purchase. Rule of Court; 2 Ld. Raym. 1101; 2 Atk. 333 to 40; 2 Stra. 1221; 1 Morg. Ess. 4; 3 Black. Com. 367; Burr, 304: Bunb. 321; 1 Vern. 86. And even if this was the improvement, and he had a right to include it, the mode of surveying I contend for would include it in a more proper manner than he has done.

The only testimony which has been brought to show that Kenton ever made any improvement on this land is Samuel Johnston's, who says Kenton was improving at Lyon's spring, the last of January, or first of February, 1780; and William Stephenson a few

days before Christmas, 1779, but either of these days was subsequent to the 1st of January, 1778, and to the 20th of December, 1779, when his certificate was granted (instead of twelve months at least prior to it); and therefore any improvement made by him at that time can not support his claim.

But admitting for a moment that this claim can be supported, I will

*Secondly.* Examine Kenton's location with the surveyor.

This entry being subsequent to McConnell's certificate can give him no right against McConnell, although it may give up land to which Kenton would have had a right under his certificate. "Lying on Elkhorn in the corner, between Preston's survey at the Cave spring and Douglass' line."

From this call it was evidently the intention of the locator that it should join Douglass' line as well as Preston's survey.

To make it do so the settlement should be surveyed in the same figure that Kenton has surveyed it, only extending from Preston's line the course continued until it intersected Douglass' line, and laying in the corner between the two.

So that if he is confined to his location with the commissioners, he will not interfere at all with McConnell's settlement, and if he is allowed to change his ground by his entry with the surveyor, which can not be against a claim in existence prior to that entry, you may put him in the corner, and a survey three times as long as wide would include his improvement. This shows he has surveyed wrong, even according to his entry with the surveyor. But even if had surveyed right according to that entry, it could not avail him against McConnell.

I will now consider McConnell's claim. The certificate was granted the 3d of January, 1780, for raising a crop of corn in 1776, "lying on the south fork of Elkhorn, to include Francis McConnell's improvement."

The entry with the surveyor the 3d of February, 1780, was in the same words, so that it may be laid aside.

The foundation of this certificate, "raising a crop of corn in 1776," was clearly a legal one. It is declared to be so by parliamentary exposition, and nothing shall contradict it. 3 P. Wms. 491; 2 Burr, 1151, 2104; 2 Black. Rep. 717–18; Salk. 53–4.

The land does lie on the waters of the South fork, and, in this, much greater precision is used than in Kenton's, and it does include Francis McConnell's improvement.

I will now consider the manner in which McConnell has surveyed his claim. From William McConnell's deposition, the improvement he sold Kenton was at the Blue spring, and although he says he intended Lyon's spring should go with it, there was no improvement there, and the certificate and entry call but for one; therefore, it must be that at the Blue spring.

McConnell has surveyed so as to leave him considerably more than half way between Keene's and Lyon's, and three-fourths between Keene's and the Blue spring.

If Kenton's claim is a good one, and he has a right to survey here from his locations with the commissioners and the surveyor, the distance ought to be divided between the improvements.

*First.* From the custom of the country and former decisions.

*Secondly.* From the agreements between William McConnell and Francis McConnell, of which William McConnell informed Kenton before he purchased.

The propriety of dividing the distance between improvements is admitted by the bill, and there is proof of an agreement in the company, of which Kenton had notice.

If this division between the improvements was proper, either from the general custom or the special agreement, Kenton has no claim, and his bill must be dismissed. From the superior equity of Francis McConnell's claim, he must prevail. From the improvements made by him on the land, and the corn raised by him adjoining it, he was clearly entitled to an actual settlement. See the case of *Crow* v. *Dougherty.*

Our case is much stronger than that. Crow raised corn in a station. McConnell raised corn on what he then considered as a part of his claim, though he discovered it was afterward Preston's; he raised the corn at one of many improvements adjoining, and all intended to secure the land for himself.

Although the certificate does not mention it, it is proper for us to give evidence of it; because Kenton can not support any claim, but by parole proof dehors his certificate. Because McConnell, having the legal title in him, and Kenton coming forward with an equitable claim only, parole proof is proper to rebut his equity, and to show that McConnell has a superior equitable right to this land. 2 Vern. 253–4, 593–4; Talb. 80, 242; 2 Ves. 28; 1 Ves. 323; 2 Atk. 99; *Crow* v. *Dougherty.*

From all these considerations, the court would decide against Kenton, if the question was between him and McConnell only.

I will now consider the question as far as the defendant Keene is interested in the dispute, and show that if Kenton could prevail against McConnell, Keene must prevail against Kenton; because,

*First*. Keene is a *bona fide* purchaser for a valuable consideration without notice.

*Secondly*. Because Kenton has been guilty of such neglect as shall bar his right against a subsequent purchaser; and

*Thirdly*. His now setting up his claim against Keene, after suffering him to purchase without giving him notice of his claim, and after delivering him possession under his purchase from McConnell, and after Keene had made such valuable improvements under that possession, is such a fraud as will bar his remedy in equity against Keene.

His claim is that of a *bona fide* purchaser without notice, etc. 2 Ves. 463, 600, 704; Amb. 766, 153, 284; 3 Atk. 304; 2 Ca. in Chan. 73, 208; 2 Eq. Cas. Ab. 195; Durnf. 762–75; 1 Vern. 27, 542.

From these authorities, it must be decided in Keene's favor as a purchaser, etc. But if there is doubt on that head, I rely,

*Secondly*. Upon this, that Kenton has been guilty of such neglect as will be a sufficient bar of any equity he might have, even against McConnell, but, at all events, against Keene as a subsequent purchaser, etc.

It appears from the proofs that McConnell surveyed his settlement the 10th February, 1783. That his patent is dated the 10th January, 1785, and McConnell's deed to Keene is dated the 10th August, 1786. That Frazier became the real proprietor of this settlement and pre-emption in February, 1780. That in 1782 he appointed Johnston as his agent; that Johnston had notice of McConnell's survey the 11th of February, 1783, the very day after it was made, and that the first step taken by Frazier to assert his claim was the bringing of this suit, which was brought on the 24th October, 1788.

Upon these facts I infer, that notice to Frazier's agent, being as effectual as notice to Frazier himself (see 1 Ves. 62; 3 Atk. 36; 1 Brown. 351; Cas. in Chan. 38; Amb. 426–7; Treat. of Eq. 69, 70; 2 Vern. 610), it was his duty to have entered a caveat against issuing of a patent to McConnell.

That although chancery will give relief against a patent in extraordinary cases, yet it will not at the instance of a party who had sufficient notice to have stopped it. See Chan. Rev. p. 94,

sec. 9, p. 96, 132; Pre. Chan. 198; 1 .P. Wms. 495; *Harrod* v. *Givens*, in the old supreme court; 2 Eq. Cas. Abr. 246; Talb. 173–4.

That the not entering the caveat was doing injustice both to McConnell and Keene. To McConnell, as it put him to the expense of patenting the land, and deprived him of the chance which he would then have had of getting other land. See Chan. Rev. 96, 169. To Keene, as it prevented him from knowing that there was a .dispute in the title, which the caveat would have given him notice of, and gave ˙him a false confidence in McConnell's right from his having a patent; therefore, it brings this case fully within those rules of equity which declare, that a plaintiff to be entitled to success in that court must come from a pure fountain, and have been guilty of no fraud or neglect which operates to the prejudice of the other side. See 2 Ves. 107, 371; Prin. Eq. 34; Treat. of Eq. 15, 16; 2 Vern. 696–7; Ambler, 647; 1 P. Wms. 264; 2 Ibid, 281.

" *Vigilantibus non dormientibus servit lex.*" *Vigilantibus juræ˙ subveniunt*, the case of *Harrod* v. *Givens*, March, 1789, comes fully up to this—there was no purchase there.

Therefore, I conclude that as Frazier has been guilty of gross neglect, which has been prejudicial to both McConnell and Keene, it shall be a bar to his remedy. against both, and more especially against Keene as a purchaser, etc. But supposing that such neglect would not, in the .general, be a bar to a relief in equity against a patentee, or a subsequent purchaser from him without notice, yet I contend :

That Frazier's conduct in this particular case ought to be a bar to his remedy against Keene.

Frazier was at that ˙time living at Lyon's spring. It is highly improbable, if not impossible, that the purchase could have been made without his knowledge; if he did know of it, his not informing Keene is a sufficient bar to his claim. See 2 Atk. 49; Cas. in Chan. 47–8; 1 P. Wms. 394; 2 Eq. Cas. 610, 618; 2 Atk. 49; 1 Ves. 96; Brown, 357.

But his conduct as to the possession can admit of no doubt, and receive no palliation, though Keene had then bought and paid for land without knowing of his claim; it was all in the woods; if he had then insisted on his title, Keene would have foreborne to improve on it, but his giving up possession then, attended with the circumstances it was, was a waiver of his right, an acknowledgment of the goodness of McConnell's claim, an inducement to

Keene to expend his money and labor on the place, and though not a bar to a legal title, is a strong circumstance to rebut an equitable claim, as the setting up such a claim at a future day against Keene must be considered as a fraud, and therefore not entitled to relief in chancery.

See cases where a man stands still and encourages another to purchase. Where relief is frequently refused to a plaintiff on grounds which would not be sufficient to decree against him if he was a defendant. See 3 P. Wms. 12, 275; 2 Eq. Cas. Abr. 113; 1 P. Wms. 458–9; Cas. in Eq. 92, 96–7; 1 Durnf. 154; Prin. Eq. 25, 549.

HUGHES, in reply.—As it is not my business to widen the inquiry, I shall not inquire into the propriety of the distinction taken by Col. Nicholas between the powers of the commissioners as a court and as agents of the commonwealth.

As agents, he admits their decisions to be final. As a court, he says it was their province to determine between contending claims. As agents, after the determination to grant a certificate.

Then, by his own doctrine, so far only as they adjudge the right, is the question open; but in whatever relates to the mode of expressing the certificate, their act is final. The dispute in this case before the commissioners was between Kenton and McConnell respecting the pond, and so far, according to the gentleman's doctrine, the question is open to inquiry.

But he goes on to inquire what right Kenton has under the commonwealth. The light in which I view this business is this: the commissioners were, in all cases, to give an adjudication on claims submitted to them, but in one case they were to issue a summons. The object of that summons was to enable one party claiming a right to a certain spot, to compel another setting up a right to the same spot to come in and submit his claim to the decision of the commissioners.

But this is no proof that a certificate granted by the commissioners was to be of no validity, because no summons had been applied for; for, in all cases, public notice of the time and place of the sitting of the commissioners was given, in order to enable claimants to lay before them the merits of their claims.

I should suppose the court of chancery here would do as the court in England did in the case reported in 2 Vern. 76.

The court there would not inquire into the probate, but refused relief on account of the fraud of the complainant; so, although

the commissioners, in the exercise of their jurisdiction to hear and determine the rights of claimants for particular services, may have given the law a different construction from that which this court would now give it, had it never been in operation, I should suppose the court would refuse to inquire into the propriety of such adjudication, and would refuse its aid to perfect the title only where it was apparent a certificate had been obtained from the commissioners by imposition and deceit.

I confess I do not see, the propriety of the distinction between the right of those to inquire into the certificates who had existing claims and those whose claims have since originated.

The certificate obtained without fraud must, I should suppose, either be received as a proof of what appears on the face of it or not.

Col. Nicholas resorts to the law of 1784, p. 23, to prove that the services for which the certificate was granted may be inquired into; I think it proves the reverse. He calls it a declaratory; I consider it as an explanatory amendatory law.

A declaratory act is an act declaring what was the law, but this law is not even declaratory, explanatory, or amendatory of the act of 1779; this is proved by the title. It is "An act to explain and amend an act entitled an act to amend an act," and the act to amend an act was the act of 1781, which gave the power formerly possessed by the commissioners to the county courts.

Let us expound this act of 1784 by rule:

*First.* What was the common law.

*Second.* The mischief.

*Third.* The remedy. And,

*Fourth.* The true reason of the remedy.

*First.* The common law has nothing to do with the question. The right was confirmed by statute; the tribunal created by statute.

*Second.* The mischief was, that after the jurisdiction was transferred to the county courts from the commissioners, the legality of a certificate could not be contested, although there was neither general or special notice of the application for it.

*Third.* The remedy: the right to contest, *sub modo.*

*Fourth.* The true reason of the remedy: I think three reasons may be given why, in the manner directed by the act, this inquiry might be made as to the certificates granted by the county courts which do not apply to the case of those granted by the commissioners.

*First.* By the act of 1779, the commissioners to be appointed in each district were not to be inhabitants of the said district.

This was well calculated to prevent partiality, and although the danger in the county courts was greater, no such provision of course could exist, as the power was given to the magistrates of the county.

*Second.* The commissioners formed a court for one special purpose only, and sat for a particular time, and beside were directed to give twenty days' previous notice of their sitting.

The county court, on the contrary, sat every month to do their ordinary business, and there is nothing which would lead a man to attend their sittings to save his claim, unless he had express notice, and that was not required by law.

*Third.* The remedy is only given in caveats, a summary proceeding prior to the emanation of a grant, the decisions in which it was supposed by the law (whatever may be the case in practice) would be speedy; and it might, as given, be given with more safety than if extended to the certificates granted by the commissioners. Because it relates to a certificate granted at a later period, and because it provides that the testimony of the court or officer present when the certificate was granted shall be received; surely, if it had been intended to extend the provisions of this law to the case of certificates granted by the commissioners, some provision also would have been made in such cases as to the testimony lost by death, etc.

I do not agree with Col. Nicholas, that the court of commissioners was a court of limited and special jurisdiction. They formed a court of special, but not of limited jurisdiction. The cases cited are of particular jurisdictions, derogating from the general jurisdiction of the courts of common law.

In our case there is nothing to attach the jurisdiction, either of a court of common law or chancery, until the certificate is granted.

So far as the commissioners heard and determined disputes for settlement or improvement, they kept within the bounds of their jurisdiction. If they had undertaken to adjudge on the right of the owner of a military survey, it would have been *coram non judice.*

The case from Gilbert's Reports, 247, which was cited to show that if a court of limited and special jurisdiction, whose determination is final when within its jurisdiction, exceeds its jurisdiction, its judgment may be set aside, is a strong one on principles of

policy and general safety to support the decisions of the commissioners.

It was the case of the forfeited Irish lands, the disputed claims to which were settled by commissioners appointed for that purpose. The question was, whether a disposition of the land by the commissioners was not *coram non judice*. The court said it was the intention of the act to provide for the settlement of those interested, and also for the peace and quiet of the kingdom, and if they adjudged the certificate to be void, no man could foresee how many other certificates and patents might be found contrary to the directions of the act.

Col. Nicholas contends that no certificate for a settlement and pre-emption could be granted for improving land. This I admit, provided the improving was not accompanied with a year's residence or raising a crop of corn.

It is true the certificate only states the evidence of the fact, instead of the fact itself; but that evidence is conclusive when the certificate is found to express, in another part of it, that Kenton had resided in the country from the year 1775 to the time the certificate was granted; for, it is certainly conclusive evidence that a man was a settler who made an improvement and resided five years.

The law required no particular form or technical nicety in wording the certificates; they were almost all worded as this is. You can collect the date of McConnell's settlement in no other way but from the time of his having had a crop of corn made.

He says, also, that Kenton having called for his improvement ought to prove that he had made it. It is only called for as an object of description, and does answer the description; it was Kenton's in 1779, and was known as his.

It is also contended that we ought to adjoin Douglass' line as we call for the corner. These entries taken together, as in *Consilla* v. *Briscoe*, that is the certificate and entry, read thus: "To adjoin Preston on the south-west, and to lie in the corner between Preston and Douglass." The first call gives the base, but as Preston's line was a long one, it was necessary to say on what part Kenton's settlement should lay.

This is as well explained by the call as if a corner was actually formed by the intersection of Preston's and Douglass' lines, for the locator's intention is evident to include his improvement, and to bind on Preston's south-west line, to the corner where Douglass' line was supposed by him to be.

There is nothing in McConnell's certificate which describes any particular place, but the call for his improvement. His chief improvement, it is proved, was at the Pond spring, and it is proved also that it was after he had obtained his certificate that the pond was discovered to be in Mary Frazier's military survey.

There is also, if it should be considered necessary, sufficient proof of notice to Keene.

BRECKENRIDGE for complainant.—It has surprised me to hear what a number of cases from the English books have been cited in the course of this lengthy argument. Cited in a case which I have considered as depending solely on an act of the assembly of Virginia.

One of two things must be evident, either that this case is very plain, that it may be seen at the first view, or so very abstracted that all these cases are necessary for the combat.

The complainant must show a complete claim in himself. Although these claims are equal on principles equal in point of merit, the complainant's is paramount in legality, prior in occupancy, paramount in law, because it contains precision and certainty.

" To adjoin Preston's survey at the Cave spring, on the south-west side."

This is the only survey Preston had on Elkhorn, and was well known to Francis and William McConnell. This survey had a side and an end, and Kenton calls for the side.

If there is any defect in this call it is the length of Preston's line, but this is cured by the entry with the surveyor, which, with the certificate, makes one entry. The requisites of a good entry are either that the entry itself will lead you to the place, or to some object which will lead you to it.

But I will not only show a good title in the complainant, but that it is paramount to the defendant's in legal precision.

McConnell has obtained a certificate as assignee of Francis, for the said Francis' having raised a crop of corn, to include the decedent's improvement.

No place is ascertained by the raising corn, and the proof of the improvement is at another place; therefore, the claim depends on the call for the waters of the South fork of Elkhorn, and is vague.

Let us now consider the legal objections to Kenton's claim. The point has perhaps never yet been settled how far the courts

have a right to investigate the proceedings of the commissioners, but the arguments are strong against it.

Certificates are conclusive records of what they speak, and of the facts they state.

If a certificate states that A made an improvement in 1775, etc., the certificate is to be taken as conclusive evidence that he did make it before, and that he did make it then. (See the case of *Consilla* v. *Briscoe.*)

The commissioners were sent out to settle questions of law and of fact, depending upon testimony; the object was to receive the testimony before it was lost, to save expense and to quiet claims; and none of these objects would be attained if the decisions of the commissioners were not to be considered as final.

Either in England or America, a fact established by a court having competent jurisdiction is conclusive against the universe.

There must be a reason for all second adjudications. What, then, is the reason that this fact is to be rejudged? If Kenton is now compelled to prove that which he was required to prove before the commissioners, he is entrapped, because he had no notice that, having then proved the fact, it would ever be necessary to prove it again. Could an appeal have been taken by McConnell from this decision? He could have proceeded by caveat only, and that only in one instance provided for by law.

The distinction taken of the double capacity of the commissioners is too subtle and refined for me.

The commissioners, in all cases, were to resort to evidence and to judge from the testimony. Where, then, is their double power?

And if, after an adjudication in favor of an individual, after he has obtained his certificate and paid the state the consideration, the propriety of granting it is to be inquired into, the holder of the certificate is completely duped.

The act of 1784 is an explanatory law, and the judges are bound by it. But it only proves that, for evident reasons, on a caveat, the owner of a treasury warrant might go into the inquiry for what services a certificate had been granted by the county court.

It is not necessary to examine the gentleman's authorities about limited jurisdictions, for we dispute with him at the very threshhold; we deny the power of any tribunal to examine into the decisions of the commissioners.

There are very few of the certificates which are to be found on the commissioners' books which are worded alike.

I will refer the court to some of them.

William Combs obtained a certificate for a settlement and pre-emption, for residing twelve months before the year 1778. Most of the certificates for village rights state, that A this day claimed a right to a settlement and pre-emption in the district of Kentucky. In the following it is omitted, that is, John Clark's, and in that the time of improving is mentioned. Benjamin Lynn's is the same as Kenton's.

Elizabeth Stevens, for residing from 1776.

James McCauley, improving the same and residing ever since 1776.

Margaret Pendergrass, improving the same and residing twelve months since her settlement.

George Holeman, by improving and residing in the country ever since 1776.

It is contended that Kenton's certificate is neither for an actual settlement or a village right. This can not be. It must be either the one or the other.

Let us go back to first principles.

Are not all the claims granted by the law to settlers or improvers founded on different grades of occupancy?

To the actual settler, who displayed not only his prowess by settling on the land, but the *animus residendi*. The land itself was given in preference to a pre-emptioner who might before have improved it, because this was the highest evidence of occupancy.

So the actual settler after 1778 is postponed to the 1,000 acre pre-emptioner, because his settlement is posterior in time. And the villager is also postponed, because the villager only evidences an intention to become an occupant.

But as the commissioners were authorized to grant only two sorts of settlements and pre-emptions, if their certificate does not express the claim they grant to have been granted for an actual settlement on the land, it could only give a right to land to which no other person had the right of pre-emption.

The case of *Consilla* v. *Briscoe* has determined the validity of the certificates, and it only remains for the holder to show the land.

Kenton has surveyed agreeably to his certificate and entry taken together, and McConnell ought not to complain of the change he made by his entry with the surveyor, for it is to his advantage

McConnell *v.* Kenton.

At the October term, in the year 1794, the following decree was pronounced :

BY THE COURT.—On considering this cause, three questions arise :

*Firstly.* Whether the services as stated in the complainant's certificate entitled him, under the law, to a settlement and pre-emption ; if not:

*Secondly.* Whether, as it appears on the face of the certificate itself, that it was granted illegally, this court has not a right to declare the certificate void in case of a contest with any other person holding a legal certificate.

*Thirdly.* If this court would not have a right to do so in the general, would it not be their duty to do so in this case, where the person claiming under the illegal certificate is complainant, and is demanding from the defendant, who has a legal right, land to which the complainant, from his own showing, has no claim built on any legal foundation.

As to the first question, the court, after examining the law, finds that there are two descriptions of persons only to whom the legislature has given the right of settlement and pre-emption. The first are the actual settlers, who at any time before the first day of January, 1778, had really and *bona fide* settled themselves or their families, or at his, her, or their charge had settled others, upon any waste or unappropriated lands on the western waters, to which no other person had any legal right or claim ; to each and every family so settled the legislature has given 400 acres of land, to include the settlement.

The second are the villagers, who, for their greater safety, had settled themselves in villages and townships, under some agreement between them of laying off the same into town lots, to be divided among them, and had from necessity cultivated a piece of ground adjoining thereto in common.

To every such family the legislature, in consideration of their settlement, allowed the like quantity of land as was allowed to the actual settlers, adjacent or convenient to their respective village or town, and to which no other person had any right of pre-emption. The law then goes on to give the pre-emption of 1,000 acres to each kind of settler on the same terms and conditions, and to prevent doubts concerning settlements the law declares that no family shall be entitled to the allowance granted to settlers unless they have made a crop of corn in the country, or resided in it at least one year since the time of their settlement.

McConnell *v.* Kenton.

Now, as there are only two descriptions of persons to whom the legislature has given the right of settlement and pre-emption, to-wit: the actual settler and villager, the explanatory clause evidently refers to those two only, by expressions peculiarly adapted to their respective situations, making the raising a crop of corn in the country by the villager, who had been engaged in the cultivation of a piece of ground in common with his brother villagers the criterion of his merit, and one year's residence, at least, of the actual settler, from the time of his settlement, as the criterion of his. That residence alone can give no right, is plain from this consideration : that the claim of a settler in consideration of settlement must include his settlement, and the claim of a villager can only be for raising a crop of corn in the country; one or the other of which being indispensably necessary under the law to entitle a person to a settlement and pre-emption, excludes altogether the idea of a person's being entitled for improving, residence, or any other services but those expressly mentioned in the law.

Therefore, the court is of opinion that the service, as stated in the commissioners' certificate, can not, under the law, entitle the complainant to a settlement and pre-emption.

*Secondly.* Whether, as it appears on the face of the certificate itself, that it was granted illegally, this court has not a right to declare the certificate void in case of a contest with any person holding a legal certificate.

It appears from the law and the nature of the case that the court of commissioners was a court of special and limited jurisdiction ; if so, then it is a principle in law that whenever a court of special and limited jurisdiction exceeds its powers, and appears to have done so on the face of their proceedings, that a judgment given by them in such a case may be set aside at any subsequent time.

Therefore, a certificate which, on the face of it, appears to have been given for services which the law did not authorize a certificate to be granted for, must be void ; because the commissioners, by their own showing, have exceeded their jurisdiction, and as far as they have done so their judgment can never be opposed to a legal right, as then the commissioners had no jurisdiction to grant a certificate but in the cases specified in the law; and as in the present case it appears on the face of the certificate that the commissioners have exceeded their jurisdiction in granting a certificate of a right of settlement and pre-emption for services not enumerated in the law.

The court is of opinion that it has a right to declare such illegal certificate void in case of a contest with any person holding a legal certificate. ' But,

*Thirdly.* Admitting that this court had not a right in the general to declare such illegal certificate void when contending with a legal one, has it not a right, and is it not their duty to do so in this case, where the person claiming under the illegal certificate is complainant, and is demanding, from a man having a legal right, the land to which, from his own showing, he has no claim built on any legal foundation.

The court, upon examining the authorities cited upon this head, find that chancery frequently makes a great distincion in her determinations, according to the situation of the person to be affected by her decisions, and an objection is often held to be sufficient to prevent a plaintiff from getting a decree, which would not be sufficient to found a decree upon against a defendant. In consequence of this principle in equity, it has frequently been determined that, notwithstanding the judgment of a court having competent jurisdiction was so far out of the reach of a court of chancery as to prevent her from interfering to set aside that judgment upon a suit brought for that purpose; yet, if application was made to enforce that judgment, chancery would not aid it by its decree without examining into the foundation and equity of the judgment, and if, upon examination, it was found to have been obtained either illegally or unjustly, would altogether refuse her assistance to enforce such judgment.

If, then, these certificates, when illegally granted, could not be set aside by a suit in chancery brought for that purpose, yet, upon a suit brought to enforce one of them obtained contrary to law, and to the prejudice of a man having a real claim under the law, chancery will refuse to enforce and give her sanction to a certificate both illegally and unjustly obtained. Inasmuch, therefore, as the complainant's certificate was illegally obtained from the commissioners, as appears upon the face of it, and the court should not in the general have a right to declare such illegal certificate to be void when contending with a legal one, yet, in the present case, where the person claiming under the illegal one is complainant, and is demanding from the defendant, who has a legal right, land to which, from the complainant's own showing, he has no claim built on any legal foundation. This court, agreeably to the principles above stated, conceive it to be their duty not only to re-

McConnell *v.* Kenton.

fuse their aid to the complainant, but to pronounce his certificate void, so far, at least, as respects the present contest.

It is, therefore, considered by the court that the complainant's bill be dismissed, and that the complainant pay to the defendants their costs in this behalf expended, etc.

Mr. WALLACE, one of the judges dissenting, delivered the following opinion:

As I can not accord with the court in its decision in this cause, the constitution imposes on me the painful task of delivering my opinion separately, to be entered on record.

On the first question stated by the court, I am of opinion that it does not appear from the face of the complainant's certificate that it was illegally granted, but that, on account of the residence therein specified, he was entitled by law to a settlement and pre-emption of any unappropriated land he chose to locate with the commissioners.

That the reasons on which I found this opinion may be better understood, I shall concisely recite what I conceive to be the substance of the law relative to this point.

The act of assembly, which ascertains who shall be entitled to claim settlement and pre-emption rights on the western waters: *First.* Allows to every person who, prior to the year 1778, had settled on any unappropriated land, a settlement right of 400 acres, to include the place on which he had thus settled. *Secondly.* This act also allows to each of those who, for greater safety, had settled together in that country in villages or townships, prior to the said year, a settlement right of the like quantity of any unappropriated land which they should choose to which no other person had, previously to such a choice being made, become entitled under this act.

The first of these classes are commonly styled actual settlers, and the second class villagers. To both these classes, under the general epithet of settlers, the act further goes on to allow pre-emptions of 1,000 acres, adjoining to their respective settlements. And then, as the act expresses it, "to prevent doubts concerning settlements," or, in other words, to specify who were the real and *bona fide* settlers intended, it declares that no family shall be entitled to the allowance therein granted to settlers unless they had made a crop of corn in the western country, and resided there at least one year since the time of settlement. On the construction of this declaration the difference in opinion arises. The court considers

the first clause of this declaration as evidently and necessarily referring to the second class of settlers only, who, as the act expresses it, "have for their greater safety settled themselves in villages or townships, under some agreement to divide the same into town lots, and have, from present necessity, cultivated a piece of ground adjoining thereto in common." But it seems to me that the expressions "town lots, and cultivated a piece of ground in common," do not concern the present question, but were used for the collateral purpose of introducing that part of the enacting clause which immediately follows, which secures to the inhabitants of such villages or townships the occupancy thereof until the necessity which drove them thither should cease.

The incidental case being thus provided for, the enacting clause further goes on to grant a settlement right to such settler in a village or township, in consideration of their settlement, and not in consideration of their cultivating a piece of ground or raising a crop of corn.

I also remark that the word settlers is repeatedly and uniformly used throughout this act, to designate those to whom settlement rights were granted, or to be granted, and more especially that the preamble to the part of the act which relates to settlements specifies, in express terms, that they were to be granted, as a compensation for the risk and expense incurred, by those who had settled in the western country, and from the reason of the case, it seems to me very absurd to suppose that the legislature contemplated a compensation to tillers of the ground more than to those who followed other occupations equally beneficial to their fellow settlers.

I further remark that cultivating a piece of ground and raising a crop of corn are not synonymous expressions, and it seems to me that giving the explanatory clause an allusion to what is not even previously expressed in the act, is making it increase the doubts it was intended to prevent. But it also seems to me to be essential to the design of a declaratory or explanatory law, or clause of a law, that it should be taken literally, and in the full extent of the expressions it contains, and never to mean more or less than is therein expressed. Therefore, I am of opinion, that both the alternative clauses of the declaration now under consideration, do equally refer to both classes of settlers, and that nothing can justify the restricting of one clause to a villager and the other to the actual settlers, but express, and unequivocal words inserted

in this declaration. I am confirmed in this opinion by the consideration that this act, so far as it relates to this question, evidently partakes of the nature of a grant, and, therefore, that every clause respecting the grant, which will admit two constructions, ought to be taken in that sense, which is most against the interest of the commonwealth, the grantor, and most for the interest of the claimants who are the grantees; and so this declaratory clause was taken by the court of commissioners, as is evident from a great number of cases on its records; and I might further observe that, as the court of commissioners have thus indiscriminately applied both clauses of this declaration to both classes of settlers, it seems to me that a regard to the beneficial influence of uniformity in decision, forbids this court now to adopt a contrary construction, when the express and unequivocal words of the declaration does not render it indispensable.

On the second question I agree with the court in opinion that, if it appears on the face of the complainant's certificate, it was granted contrary to law, this court ought to declare it void, if it also appears that the defendant had, in any manner, a prior claim thereto under the law.

The law and the reason of the case would then make it necessary for the court to declare the certificate void, or what is the same in effect, to give preference to the eldest legal claim.

But it does not seem to me that either law, justice or public utility require that the defendant, McConnell, who had not specifically appropriated the land, when it was granted by the court of commissioners to the complainant, should be allowed to contest the validity of the grant, either by virtue of a general vested right, which he then had to locate vacant land, or by virtue of any location or survey which he has since made on the land. Certain I am he could not, under such a general right, have, with propriety, been admitted to contest the complainant's grant before the court of commissioners, as the defendant could not then have shown any special injury he would have suffered thereby, much less should he be permitted to contest it after it has received confirmation from *the commonwealth by whose agents it was granted.* I am of opinion that it can be of no consequence to determine whether the court of commissioners made this grant in a ministerial or judicial capacity, or whether the court acted under a limited or general jurisdiction. It might, however, be observed, that that court, in deciding on settlement and pre-emption rights,

were to be governed by such rules and principles of law and equity as were applicable, and ought to have been observed had that business been brought before the ordinary courts of law and equity (without any exceptions, only those which related to the summary mode in which that court was required to proceed), which was a power as unlimited as could have been given to any court by a free government, and gives the decisions and adjudications of the commissioners on settlement and pre-emption rights, all the validity and solemnity which the decisions of a court of the most general original jurisdiction only could possibly have. Therefore, it seems to me that, on general principles only, such proceedings of the court of commissioners can, with propriety, be revised or corrected.

But in this cause, at least, it seems to me to be sufficient, that it appears on the records of the court of commissioners, not yet falsified or annulled, that a grant was made to them by the complainant, and of consequence that the land described in the grant was thereby appropriated.

Locators of every description are equally confined by law to lands unappropriated. by others at the time of making their locations. And it seems to me that this is the condition to which they are subjected by justice and public utility, as well as by law. For otherwise, the commonwealth, by the ignorance of its agents would, without rendering an equivalent, derive large sums of money from her citizens who had been guilty of no crime, to subject them to such forfeitures, and it can not be that public utility will be promoted by a doctrine contrary to the general apprehension of claimants to land in this country, and which is not authorized by the existing decisions of any of its courts, and what is of higher consideration, which will authorize numberless contests for land not heretofore thought of.

On the third question, I so far agree in opinion with the court, that he who comes into a court of justice must make it appear he has done what is equitable before he can receive equity. But I differ very materially from the court in the application of this principle.

It is also a principle of law, equally well established, that fraud shall not be imputed until it is proven to have been practiced. In this case no fraud is charged or proven against the complainant in obtaining his certificate. If then, it were so, that he was not entitled by law to a settlement right, it will only follow that his

McConnell *v.* Kenton.

claim was made and granted under an innocent mistake of the law, or the fault ought solely be imputed to the commonwealth and her agents, the commissioners, to whose decision, as it evidently appears from the face of the certificate, the complainant fairly submitted the merits of his claim, when he obtained from them this grant, and the complainant having proceeded thereon to do, and the commonwealth to receive what the law required to confirm it: I am of opinion that the complainant has complied with all the equity arising, or the case could demand, and that he ought to hold this land under the grant which he has thus confirmed against the commonwealth, and of consequence against the defendants and every other individual of the commonwealth who has not, under the law, previously acquired a special claim thereto.

On the whole, inasmuch as it appears to me that the certificate of the complainant is the oldest, that it has been legally obtained, and the proceedings thereon, so far as concerns his settlement, have also been legal, I am of opinion that the decree of the court should have been in his favor.     CALEB WALLACE.

After pronouncing the said decree, two of the attorneys having given the following certificate, that there was error in the same, agreeably to the rule of court, to-wit:

"We do certify, that we believe there is error in the decree of the court in this cause, because the court have given their opinion that the services enumerated in the complainant's certificate did not entitle him to a settlement and pre-emption, and that they have a right to declare it to be void. And we are of this opinion because we think:

"*First.* That the services stated in the certificate did by law entitle the complainant to his settlement and pre-emption.

"*Secondly.* That the certificate of the commissioners ought to be considered as final and conclusive.

"*Thirdly.* That the points on which the court have determined the cause are not put in issue by the bill and answer.

"The court directed the cause to be reheard on the errors assigned, at the May term ensuing, at which time the argument came on.

HUGHES for complainant.—By the decree complained of, the court have directed the complainant's bill to be dismissed, and in assigning their reasons they have given an opinion on three points:

"*First.* That the services, as stated in the complainant's certificate, did not entitle him, under the law, to a settlement and preemption.

"*Second.* That as it appears on the face of the certificate itself, that it was granted illegally, the court have a right to declare it void.

"*Third.* That if they have not such a right in the general, they have in this case, where the person claiming, under the illegal certificate is complainant, and is demanding from the defendant, who has a legal right, land to which the complainant, from his own showing, has no claim built on any legal foundation."

In the certificate upon which this rehearing was granted, we certify that we believe there is error in the decree.

*First.* Because we think that the services stated in the certificate did, by law, entitle the complainant to his settlement and preemption.

*Second.* That the certificate of the commissioners ought to be considered as final and conclusive.

*Third.* That the points on which the court have determined the cause are not put in issue by the bill and answer.

The legislature of Virginia, by their act of 1779 Chan. (Rev. page 92), have allowed to every person who, prior to the first day of January, in the year 1778, had settled on any waste or unappropriated land, 400 acres to include his settlement.

And to every person who, before that time, had settled in a township or village, 400 acres adjacent to such township or village, etc.

And to each the pre-emption of 1,000 acres to adjoin their settlements.

And to prevent doubts they have declared that no family should be entitled to the allowance granted to settlers by the said act, unless they had made a crop of corn, or resided there at least one year from the time of their settlement.

Upon the construction of this clause the question must depend.

I shall first endeavor to explain the meaning of this clause from the words themselves, and the order in which they are arranged.

*Second.* From the circumstances and reason of the case inquire what was the intention of the legislature; and,

*Third.* Expound it by legal rules of construction.

*First.* By the two antecedent clauses provision is made for the two classes of settlers.

To the first, 400 acres is given to include their settlement.

To the second, 400 acres in consideration of their settlement adjacent or convenient to their village or township, and by the clause which has caused the difference of opinion, and which relates to the two antecedent clauses before mentioned, families are declared not to be entitled to the allowance granted to settlers, without distinction between the different classes of settlers, until, besides their settlements, they have done one of two things, that is, made a crop of corn in the country, or resided there one year from the time of their settlement.

According to the rules of syntax, and what is more to the purpose, according to common acceptation, the two parts of the explanatory clause evidently relate equally to the two classes of settlers; and, if they did not, from the manner in which the words are arranged, the raising corn would be necessary to complete the title of the actual settler, the residence of a year to complete that of the villager. That the cotemporaneous construction applies to both, I shall hereafter show; that such construction is now entertained, I am justified in saying from the opinion of one of your honors in this cause.

The court say this explanatory clause refers to the two classes of settlers, by expressions peculiarly adapted to their respective situations, making the raising a crop of corn in the country by the villager, who had been engaged in the cultivation of a piece of ground in common with his brother villagers, the criterion of his merit, and one year's residence at least of the actual settler the criterion of his.

This opinion not only declares the raising a crop of corn to be the necessary criterion of the villager's merit, but that twelve months' residence is also necessary to perfect the claim of the actual settler.

This idea I find is taken up from these words: " And, whereas, several families, for their greater safety," etc., " under same agreement, etc., and have, from present necessity, cultivated a piece of ground adjoining thereto in common."

But these words are, in my opinion, a strong argument in favor of a contrary construction.

The intent of the legislature evidently expressed, was not only that the settlers should have an allowance for the charge and risk they had incurred, but that the property so acquired should be secured to them.

To the actual settler they give 400 acres, to include his settlement. But to the villager, compelled for greater safety, etc., they give 400 acres adjacent, in consideration of settlement, with the addition of reserving 640 acres, in common, as their present settlement.

So far there is only this difference between the settlers: The first became entitled to his own settlement, the other to remain in his village, and to locate an equal quantity, to which no other person had, by that act, the right of pre-emption.

In order to support this construction the words "raising a crop" must be clearly more applicable to a villager than an actual settler.

This is not the case, the words "cultivated a piece of ground in common," are introduced in the preamble to show the necessity of reserving 640 acres of land, and do not prove that a villager was more likely to make corn in the country than an actual settler.

On the contrary the reverse of the proposition is true.

Among men, associated together in villages or towns, a division of labor takes place by which all can be supported with the greatest convenience to all.

By this division of labor, it must have happened in the station, that the common crop of corn was raised by some of the settlers, while others hunted, and others were employed as mechanics; but the actual settler must have raised his own crop of corn.

Besides, the words will not, taken strictly, apply to the case of the settler who assisted to make the common crop, for it requires that each settler shall have made a crop of corn in the country, and not in the common field adjacent to the village.

I have been told, and do believe, that the clause of residence was introduced to save the claims of some of the first adventurers, who had never made corn, and that a year's residence was thought a sufficient evidence of a permanency of settlement, which was all the legislature had in contemplation to provide for.

Again, the court say, that residence alone can give no right is plain from this consideration, that the claim of a settler, in consideration of settlement, must include his settlement, and the claim of a villager can only be for raising a crop of corn in the country.

But, if it is doubtful, the intention of the legislature is to be sought for, and this brings me to the second point.

*Second.* The intention of the legislature, from the circumstances and reason of the case: The intention, say the authorities, is to be discovered from a consideration of the old law. The mischief and the remedy.

And the law is to be so construed as to suppress the mischief, and advance the remedy.   1 Black. Com. 87.

In this case the settlers had settled themselves upon the western waters without legal authority.

The mischief: Their not having been able to acquire titles, or rather having no allowance for the charge and risk they had been at, and that the property so acquired had not been secured to them.

The remedy: Securing to such settlers the property so acquired.

It is the duty of the court so to construe this clause as to extend the benefit of the law to every description of settler, and that was evidently the intention of the legislature.

*Third.* I contend that, according to legal rules of construction, the two parts of the explanatory clause apply equally to the two descriptions of settlers.

An explanatory clause of a law is certainly to have the same effect as a law explanatory of a former law.

Statutes of explanation shall be construed only according to the words, and not with any equity of intendment (19 Vin. Abr. tit. Stat. p. 517; Ca. 62; 1 Durnf. 728, 778), and can not be extended beyond the words.

The express words of the law are, that no family shall be entitled to the allowance granted to settlers by this act, unless they have made a crop of corn, or resided, etc.   And it is only by intendment that these words can be said to refer to the two classes by expressions peculiarly adapted to their respective situations.

If a particular thing be given or limited by the preceding parts of a statute, it shall not be altered by any subsequent general words.   4 Bac. 645; Ca. 17.

If the meaning of a statute be doubtful, the consequences are to be considered.   4 Bac. 652; Ca. 94; 19 Vin. Abr. tit. Stat. p. 520; Ca. 93.

Cotemporaneous exposition shall be taken.   4 Bac. 648; Ca. 40; Gilb. Rep. 246.

I consider the decisions of the commissioners as the contemporaneous exposition.

That the commissioners granted certificates for actual settlements, for settling or improving the land, and either making corn, or residing one year, and certificates for village rights for settling and residing a year, or settling and making corn, for residence only, or making corn only.

I refer the court to the commissioners' book to prove.

But if it was doubtful whether the services enumerated in Kenton's certificate did by law entitle him to a settlement and preemption; it is a question which can not now be inquired into, because it has been judicially determined by a court, from whose decisions there is now no appeal, and over which this court neither has or ever had a controlling power.

The commissioners in determining on the right of a party to a certificate, acted judicially.

The difference between a judicial and ministerial act is this; a judicial act is performed by a person having power to hear and determine.

A ministerial act, by a person acting in obedience to the commands of another. 2 Durnf. 396.

The common definition is, that every act is judicial, where the party doing it exercises his judgment upon it.

But Lord Mansfield, 3 Burr, 1262, says it is too large, and that a judicial act is supposed to be done *pendente lite*, of some kind or other.

Lord Mansfield does not confine the definition to the judgment of a court, in which there is in the literal sense, an *actor* and *reus*, but to the *lis pendens* of some kind or other.

Indeed, here is the *actor*, *reus*, and *judex*. The law gave right to the party, and appointed the commissioners to give judgment on it.

A sheriff acts judicially in determining the election of knights of the shire, coroners and venderors or determining the qualifications of the voters. 1 Black. Com. 343.

So a coroner concerning *treasure trove*. 1 Black. Com. 349.

These authorities show what was meant by *pendente lite*, of some kind or other.

These offices are partly ministerial, and partly judicial, such is the office of a sheriff in one case, on a writ of admeasurement of pasture, a writ of *redisseissin*, of inquiry of waste and a *nativo habendo* (4 Bacon, 445), in which cases it is said the writ is a commission to the sheriff, and he becomes a judge by virtue thereof in the cause. 4 Bac. 449.

A constable sometimes acts judicially. 2 Durnf. 406.

If the commissioners acted ministerially at all, it was in issuing the certificate, after having by an adjudication determined the right against the commonwealth, and in that case it is the minis-

McConnell v. Kenton.

terial act of their clerk, and unless the issuing judicial process from all courts is a ministerial act of the court, the issuing of certificates was not so in the commissioners.

The certificate is only the copy of the adjudication of the commissioners, necessary to the party, and directed to be given to him by the law, and it is the legal effect of that adjudication which is in question.

The commissioners shall deliver to every person to whom they shall adjudge lands for settlement a certificate, etc. Chan. Rev. 93.

From the law it is evident judicial authority was given to the commissioners.

The first object was to ascertain and determine the right against the commonwealth, that the land left unappropriated might be sold.

A secondary object was to secure the different claimants from the expense and inconvenience of future litigation. "The said commissioners shall have power to hear and determine all titles, etc., to which no other person hath a legal title." Chan. Rev. 93.

A power to hear and determine must vest judicial authority.

"If they shall fail to meet after adjournment, no matter before them shall be discontinued." Chan. Rev. 93.

And in the succeeding lines they are constituted a court of record, they are directed to appoint a clerk, the sheriff was directed to attend them, and they were invested with power to punish contempts.

"The said commissioners shall deliver to every person to whom they shall adjudge lands for settlement a certificate," etc. Chan. Rev. 93.

There was no mode, except by an application in one instance to the general court, by which the decisions of the commissioners could be revised.

And no court has now jurisdiction to revise them. It would not be considered in England, as within the general superintending controlling power of the court of king's bench, because the proceedings were not according to the course of the common law. Cowp. 524–5.

I am authorized to say that the commissioners had a peculiar jurisdiction to hear and determine the rights of claimants against the commonwealth for settlement, etc.

19

It is a settled principle that where any matter belongs to the jurisdiction of one court so peculiarly, that other courts can only take cognizance of the same subject indirectly and incidentally, the latter are bound by the decision of the former, and must give credit to it. Bull. N. P. 244, 247; 2 P. Wms. 287; Dougl. 560; Cowp. 315, 322; 2 Burr, 1009; 4 Co. 29 a; 2 Wils. 118, 127; 7 Co. 41 b; Carth. 225; Hard. Ca. 11, 12, 18; Stra. 960, 691; 2 Black. 977, 1176; 1 Ves. 333.

Such is the present case, no court either of law or equity could either grant a certificate, or reverse the decisions of the commissioners, nor could a *certiorari* or a prohibition lay from any court.

The jurisdiction of the ecclesiastical court in England is a case in point.

*First.* Of the effects of their sentences in granting administrations and probates of wills.

They are conclusive evidence. 1 Salk. 290; 1 Ld. Raym. 262; 1 Strange, 481, 763; 2 Chan. Ca. 178; 2 Vern. 8, 76; 1 P. Wms. 12, 388, 548; 1 Ves. 287; 1 Atk. 630.

Perhaps, in some of these cases, which are concerning probates, the court will find that it has been doubted whether a probate granted in common form, being scarcely a judicial act, is conclusive.

The reason of this is, that within thirty years it might be called in question in the ecclesiastical court, and therefore is not final, and not because it is a ministerial act. But I believe it will be found to be considered as conclusive evidence until reversed.

*Second.* The sentences of admiralty courts. 2 Ld. Raym. 893; Carth. 32; Cowp. 315; Dougl. 560.

I will now inquire whether the law (Chan. Rev. 93), having declared upon a trial upon a summons that the judgment should be final, it can from thence be concluded, that the other adjudications of the commissioners shall not be so. And this brings me to the secondary intention of the law.

To secure the different claimants from the expense and inconvenience of future litigation.

Suppose two persons obtained certificates for the same land, either under the same kind of rights or under different ones, the court would have to determine between the parties, and would do so without impugning the certificates.

As if both were actual settlers, the first was entitled. But if on application of the second, the commissioners not being informed

McConnell v. Kenton.

that the settler claimed the same land they had before granted, issued a second certificate, although the question of right between the parties might have been determined by the commissioners, not being so, it is left to the courts to say what passed by the certificate.

So that in the first case, the commissioners determine the right of the party to claim land of the commonwealth, and this I contend, from the nature of the case, is final.

And in the second where two claim the same land, the said commissioners were authorized on a summons to determine finally between them, whose claim against the commonwealth was the best.

But it is contended, that chancery will not lend her aid, even if the certificate is final, where the complainant has been guilty of fraud, but leave him to make the best of his title at law.

To this I answer, Kenton has been guilty of no fraud, and unless the court refuse relief in all cases against the eldest grant, they will afford it to Kenton.

*Ex equo et bono,* he ought to prevail; the special tribunal appointed to inquire into his claim, has adjudged it to be good, and he has not fraudulently, as the defendant has done, attempted to get other land than that adjudged to him.

NICHOLAS for the defendants.—It has been contended that the decisions of the commissioners like the sentences of the ecclesiastical courts are final, and can not be examined into in the courts before whom the question is brought incidentally and collaterally.

Admitting, for the sake of argument, that the doctrine is as contended for, it does not apply here unless it shall be determined that our supreme court had no cognizance of any of these cases, either under their general jurisdiction, or under the powers given by any of the acts as to caveats, etc.

And even then it will only apply where a party goes into chancery to attack such a right, for there is a distinction between the party himself applying to a court of chancery to enforce such a sentence, and the application of another to declare it void; even in the general, there is a difference made between cases where the party is plaintiff or defendant.

The authority goes no farther than to prove (which I do not admit it does) that the court has no power to decide on the legality of the settlement certified in the certificate, but leaves the court to decide on the fact of the settlement or improvement. Therefore, though the certificate says he made an improvement, etc., yet un-

McConnell v. Kenton.

less he can prove it to be on the land claimed, it will not avail him, and the opposite party may contest the fact of the improvement, though not the legality of the certificate.

The authorities say collusion may be given in evidence to avoid the sentence.

Here it will be matter of doubt what will be sufficient evidence of fraud; and whether the obtaining a certificate for a service not enumerated in the land law is not so.

In Briscoe's case, the obtaining a second certificate for a second service, although that was a legal service, was considered as fraudulent; by the same reason, obtaining one without any legal service must be so too.

The cases of pre-emptions for improving, carry strong marks of fraud with them, because none of the certificates mention, that those improvements were made for them by others; this proves one of two things, either that the commissioners were deceived by false testimony; or, that knowing the law did not sanction such claims as were proved, they stated in their certificates such as the law did allow, although it was not such as were proved; if either of these was the case, it would amount to collusion, sufficient to set aside the certificates.

In all contests about land, the question is, which of the parties has the superior equity; upon the trial of this issue (where settlement and pre-emption claims are in dispute) a certificate becomes essential to the title of the party; therefore, the lawfulness of the certificate is as much the proper subject of the trial as any other incidental fact material to the issue.

And, therefore, from this principle the lawfulness of the certificate may be inquired into; and notwithstanding it is laid down, that upon such inquiry the court will not, if any sentence of a court of peculiar jurisdiction is offered in proof, suffer any point asserted by the sentence to be controverted; yet it must be understood with this restriction, that the thing or point so asserted in that sentence, is within the jurisdiction of the court giving the sentence; for it is a well established principle of law, that no regard is due or to be paid to the certificate of a court as to a matter out of its jurisdiction. 7 Co. 41 b, 43 b; Carth. 225; Hard. Ca. 18; Harg. Law Tr. 456 note, 457; Salk. 290; Plowd. 281-2; 1 Sid. 359; 1 Lev. 235; 2 Black. 979; Harg. Law Tr. 462, 473; 2 Vern. 8, 77; 1 P. Wms. 12, 267, 289, 388; 2 P. Wms. 286; Ld. Raym. 892.

McConnell *v.* Kenton.

Therefore, where the certificate is of a matter being done by the party, of which the law did not give them cognizance, and for which the law made no allowance to the party performing it, their certificate is a dead letter, as being of a thing not within their jurisdiction, and therefore may be disputed as well upon the matter of fact, as upon the matter of law contained in such certificate.

But beyond all question, if the certificate on the face of it is illegal, as having been given for what the law did not allow one, such certificate may be rejected altogether upon the question between the parties, who has the superior equity to a piece of land under the law.

The case of *Bunting* v. *Lepingwell*, 4 Co. 29 a, has been cited. The reasoning of Lord Coke in that case does not apply here.

There the spiritual court not only had cognizance of the matter, but by their constitution was to decide on it according to the law of holy church; and the court of common law had no authority to control them when acting within their jurisdiction; therefore, having complete jurisdiction of the matter they had decided on, their judgment should be conclusive evidence to all other courts. But it does not follow that it would have been so, if they had exceeded their jurisdiction.

The case of 2 Wils. 118, 127, contradicts the doctrine, because the sentence there was not allowed to be conclusive evidence; but the matter was sent for further trial by the bishop's certificate. It is immaterial what the mode of trial was, it is sufficient that it was to be subject to another. Lord Bathurst, indeed, says he does not know whether the bishop can certify contrary to the sentence; but it would have been nugatory to have referred it to him, if he was absolutely bound to certify conformably to the sentence.

Kinn's case from 7 Co. 41 b, from the reason given, does not apply here, because there the sentence if improper or unjust could be reversed by application to a superior spiritual court; here it must be reversed in this way, and in this court, or not at all; so that this case, considering this application as being to the only court, which could inquire into the merits of the former determination, is an authority in favor of the revision, as it shows that all such sentences ought to be re-examined somewhere. The same case, page 43 b, shows expressly that a sentence on a matter out of the jurisdiction ought to have no weight.

In Carth. 235. The suit in the spiritual court was against one

under whom the plaintiff claimed; therefore, he might be considered as a privy to the judgment; its being declared to be evidence only while unrepealed, brings it within the observations made in Kinn's case.

But it is said "against all matters precedent, this sentence was conclusive," which necessarily must have been examined into by the court in giving their sentence; this will exclude all decisions not adversary, and of consequence those certificates where there was no dispute.

Hard. Ca. 11, 12, and Strange, 960, are strong authorities, that it must be an adversary suit, for it must not only be determined, but it must be the point in issue, for where it was only incidentally determined, no regard was paid to it.

In Hard. 18, and 2 Strange, 691, *Da Costo* v. *Villa Real.* The sentence was allowed to be conclusive.

*First.* Because it was obtained in a principal cause.

*Second.* Because in a matter whereof the spiritual court had proper jurisdiction.

2 Black. 977, and the cases cited in it rather prove it ought not to be conclusive where there was no notice or party; because he argues in that case, that there was sufficient notice, and by implication admits, it would not have been binding, if there had not been that notice.

2 Black. 1176. This case makes an important declaration. The judgment of a superior court is final, but not of an inferior one.

The reason why it was not allowed to controvert the judgments of the spiritual courts although inferior, was, because they had superior courts to correct their judgments, were governed by different laws, and had exclusive jurisdiction; but none of those reasons apply here, and then as an inferior court governed by the same laws, their sentence is not final.

Cases of concurrent jurisdiction do not apply; because that is when they are on equality, here is an inferiority and dependence, which, and the privilege of review would be destroyed by admitting their sentence to be conclusive evidence.

The case of *Thomas* v. *Ketteridge*, 1 Ves. 333, was so determined because the spiritual court had concurrent jurisdiction, and would decide the question according to the civil law; and, therefore, that court ought to do the same.

But here there is no clashing of law; no other jurisdiction, and

McConnell *v.* Kenton.

Kenton is complainant in this court; therefore, the case does not apply.

The court will find none of the cases apply to the present case, they have all been determined on particular circumstances and the situation of the law, and the jurisdictions, which here do not exist.

The general court had certainly a concurrent jurisdiction or an appellate one in some cases at least; and in all, if the instances named in the law, be considered as only put by way of example; they had it also from the want of negative words in the act; and chancery certainly retained its equitable jurisdiction if not expressly ousted.

And this is not as strong an instance as the application of equitable principles to the statute of frauds, and relieving against cases expressly denied it by the statute.

The arguments as to the point of fraud here are much stronger, for if they are right instead of having only one court for its detection there would be none.

In Briscoe's case the court either relieved, because they had jurisdiction to inquire into the certificate, or because the fraud of Briscoe gave the jurisdiction; if they had it they have it in all contests where a certificate is shown. If the jurisdiction was given by the fraud, which they would not have had independent of the fraud, the case will apply to all those, where the conscience of the party obtaining the certificate is affected, which must be the case, wherever a man has obtained land without a legal foundation, to the exclusion of another, who had a legal claim.

Having said so much on the general principle contended for, I will proceed to answer the other arguments used by the complainant's counsel.

It has been contended, that the certificates were granted to villagers in consideration of their settlement, I can not understand it so, surely the preamble applies equally to all parts of the enacting clause, and the part that applies here, is, that they settled under an agreement.

An explanatory clause of the law, is a different thing from an explanatory law, but this clause is a proviso or a condition, and in order to understand it you must take it in the order it stands, without transposing the words. 1 Durnf. 645; Leach. 318, 340; And. 80; Salk. 612.

In the construction of an act, it is so to be taken as to give effect to the whole. Cowp. 558, 559; 1 Black. Com. 87, 89. And the decree does give force and efficacy to the whole.

Although the certificate is considered as a grant, the construction of it not to be strained.

The grant of the king is taken most strongly in his favor, and a proviso, exception or condition is to be construed most favorably for the grantor. 3 Com. Dig. 456; Powell on Pow. 10, 13; Powell on Cont. 396, 397; Cowp. 127, 191; Henry Black. 424, 426, 597, 656; Dougl. 734; 1 Durnf. 44, 51, 616.

The manner in which the clause is worded is material, the words are in the negative.

It is relied upon, that this certificate is not falsified or annulled, but nothing is necessary to be done to annul it, for wherever a court gives a judgment in a case without its jurisdiction it is a nullity. Cowp. 642, 647; Dougl. 676, 677; 4 Durnf. 192, 704.

It is admitted, that if the commissioners had granted a certificate for a settlement and pre-emption for military service, that the certificate would have been void, and it would have been so, because not within their jurisdiction.

Is it not equally so, if granted for any other service not within the law? Powell on Pow. 344, 347, 357, 358; 4 Durnf. 473, note.

But it is said it was not necessary to state the nature of the service: Why did the law give directions to the commissioners, how to issue the certificate, unless it was intended the cause appearing on the face of the certificate should operate as a check and control?

If they have certified the cause, and that is not sufficient, the certificate must be void. Burr, 246, 247, 930, 1312, 2102; 4 Durnf. 473, 479.

It is not important for the complainant to urge that it was the opinion of the commissioners, and of the people at the time they sat, that either raising corn or residence would entitle a villager to his certificate, for if the construction is contrary to the act it can not prevail. Cowp. 183.

At the August term, 1795, the following decree on the rehearing was pronounced:

By THE COURT.—In the decree which was made in this cause, the error assigned is: That the court has adjudged that the services enumerated in the certificate of the complainant, did not entitle him to a settlement and pre-emption; and that the court has a right to declare it to be void.

As to the latter clause of the error which is alleged, it seems to the court:

McConnell *v.* Kenton.

*First.* That a certificate issued by the commissioners vests the holder of it with an indisputable right against the commonwealth to the land it specifies, because government has ratified the certificate by receiving the price of the land ; or if having done this does not exclude an investigation of the right on behalf of the commonwealth, the other officers of government having been specially authorized and required to receive the price, and complete the title of the land, without an inquiry into the legality of the certificate, being also specially authorized, makes it evident, that it was the intention of the legislature to abide by the decision of the commissioners, and it might be further observed, that public utility absolutely forbade it to be otherwise.

*Second.* That the commonwealth having thus publicly transferred, or engaged to transfer its right, from general principles it is clear that an individual, who may afterward have located the same land, under the purchase of a general right to appropriate vacant land, can not contest the validity of the certificate.   Besides it is as clear from the land law, that such a purchaser had only a right to locate unappropriated land, and for this reason also, he ought not to be permitted to contest the legality of the certificate. From these considerations, it is evident, that this case is an exception to the rule of law, that an illegal execution of a power is no bar to a subsequent legal execution of it.   But,

*Third.* Where any person had by law a vested right to land, when a certificate was fraudulently or erroneously obtained for it by another, it seems to the court, that the privilege of contesting the certificate is evidently given to the person thus injured, by that clause of the land law which authorizes a caveat to be entered against any survey, by a person who has a better right to the land it contains ; and that this privilege is as evidently implied in those clauses which point out on what lands settlement and pre-emption rights should be allowed, and to which they should be restricted.

The only exception contained in this law is, where there was a contest between the parties before the commissioners, and this exception is so expressed as necessarily to imply the privilege as to all others.

This implication is put beyond doubt, by a principle of common law which is universal, that no one is bound by any ministerial or judicial decision who was not a party or privy thereto.   Neither does public utility require, nor can it ever justify the transferring a vested right from a legal claimant, to one who afterward

acquired his claim by fraud or mistake. As the defendant claims as a villager, he had not a vested right to the land in contest before he obtained his certificate, and as his certificate is younger than that of the complainant. The court is now of opinion for the reasons that have been stated, that the certificate of the complainant, even if it were manifestly illegal, can not be avoided by the defendant.

But on considering the first clause of the error assigned, the court is also now of opinion, that for the residence specified in the certificate of the complainant, he was entitled under the law to claim a settlement and pre-emption, for the following reasons :

*First.* It seems to the court, that the declaration in the land law, by which the point ought solely to be ascertained, is explanatory in its nature, and like other explanatory acts or clauses, it should be taken literally, for an explanation of an explanation is an absurdity, nor ought reference to be had to the act explained for the meaning of any word or sentence the explanation contains, only those which are repeated therein from the act. In this instance only, the word settler is repeated from the act, where it is used to designate any of those who had settled on the western waters, either on lands which they had chosen for themselves, or in villages or townships; therefore it must have the same meaning in the declaration. It equally designates both classes of settlers, and consequently the declaration requires that the several claimants should have made a crop of corn or resided one year at the places which they had respectively settled.

*Second.* It does not seem to the court, that the reason and nature of the case, will justify the making any distinction between those two classes of settlers as to what will entitle them to settlements.

The risk and charge of settling on the western waters are expressly recited, as the services for which a compensation was allowed to them, and by this declaration it evidently appears to have been the intention of the legislature only to fix a criterion by which real settlers might be distinguished from transient persons. If so, certainly a year's residence or raising a crop of corn at their respective places of abode, would be as good evidence of the intention of a person of one of these classes, as that of a person of the other class.

*Third.* The commissioners in a very great number of instances, did thus construe this declaration, and it seems to the court that a

proper regard to uniformity of decision, requires that the construction which they gave to it should be established, more especially as it does not appear to admit of any other which is not equally doubtful.

It does not appear very material in this case, to ascertain whether the commissioners made this construction in a ministerial or judicial capacity, for be that as it would, they were entrusted to expound the law under which they acted. It may however be observed, that when there was a contest, their construction was certainly judicial, and it can not be supposed, that they would vary the construction when it was ministerial. Therefore all their constructions on this law, must be considered as having at least equal solemnity with the constructions of other judicial courts of original jurisdiction only. Perhaps indeed they ought to have more solemnity, as their judgment on all contested cases where there was a full hearing was final. So that to this case, the maxim is peculiarly applicable: *contemporanea expositio est fortissima in lege.*

The court being of opinion, that the decree made in this cause is erroneous in the point of view which is stated in the error assigned as cause for a rehearing, it becomes necessary to decide on two questions not before considered, to ascertain how much land if any he is entitled to recover of the defendants:

*First.* Are the complainant's location of his settlement with the commissioners, and the entry thereof with the surveyor, uniform and sufficiently particular, and if they are so, has he surveyed his settlement agreeable thereto?

*Second.* Is the defendant's location with the commissioners, which was made prior to the complainant's entry with the surveyor, sufficiently special, and does the complainant's survey interfere with it?

On the first question the court is of opinion, that the complainant's location with the commissioners, and his entry with the surveyor, are as particular and special as the law requires; but it seems that the words in the entry, "In the corner between Col. Preston's survey, and Douglass' line," contain an explanation of his location with the commissioners which is a material addition thereto, and ought to be considered as having the same effect as an amendment to any other location: the owner is bound by it, and all subsequent locators.

This makes it necessary to introduce the second question. On

which the court is of opinion, that as the defendant in his certificate calls for his improvement as heir-at-law to Francis McConnell, without any other special description, and now shows several improvements made by the said Francis, therefore the location is either too vague to be regarded, or it must be fixed to the improvement at the Pond spring, which it clearly appears from testimony, was the most notorious and generally known, and which from the surveyor's report appears to lie out of the way of the complainant's location with the commissioners, and his amendment to it with the surveyor. It then remains to consider whether the complainant has surveyed agreeably to them. The only doubt arises from his not having adjoined Douglass' line, but as he calls for the corner between Col. Preston's survey and Douglass' line, and it appearing that Preston's survey was on record, and that there was no record of Douglass' line, but only that there was a line known to many persons by that name, it seems evident that the complainant supposed Douglass' line run off from the corner of Preston's survey, and in that way formed a corner in which he was mistaken : Therefore the court is of opinion that if the complainant had extended his survey farther toward Douglass' line than the corner of Preston's survey, that it would have been contrary to the apparent intention of the entry : And from the surveyor's report it further appears, that should the complainant's survey be made more strictly conformable to the other calls of his entry, it should still include the same land, so far as the defendants are interested, which he has surveyed.

Whereupon it is decreed and ordered that the complainant do recover of the defendants respectively, all the land contained in his said survey, and which is included within the boundary lines of the defendant McConnell's patent. Order of survey, etc.

BENJAMIN SEBASTIAN, Esq., one of the judges, dissenting from the court, delivered the following opinion, to-wit :

The errors stated and relied on by the counsel for the complainant, are :

*First.* That the service stated in the certificate did by law entitle the complainant to his settlement and pre-emption.

*Second.* That the certificate of the commissioners ought to be considered as conclusive and final.

The counsel for the complainant in order to prove that he is entitled to a settlement and pre-emption, have contended that the first part of the declaratory clause, viz : raising corn, must by gram-

McConnell v. Kenton.

matical construction be applied to the actual settler, and that one year's residence alone, without having made any actual settlement or raised a crop of corn in the country, was sufficient under the law, to entitle a man to a settlement and pre-emption; indeed it was contended that each part of the declaratory clause must be indifferently applied to each kind of settler.

I do not think it material to inquire into the grammatical construction of this declaratory clause. My object is to find out the meaning of the legislature, and if in expressing their meaning, they have been guilty of grammatical inaccuracy, yet I believe it has never been known, that a grammatical inaccuracy has such weight as to destroy the meaning and intention of an act of parliament, when that meaning and intention is to be collected from the general scope, and the particular expressions of the act.

There are two descriptions of persons only entitled to settlements and pre-emptions, to-wit, the actual settler and the villager. The actual settler who had really and *bona fide* settled himself or his family, or at his costs had settled others, on any waste or unappropriated lands on the western waters, is allowed for every family so settled 400 acres of land to include such settlement.

The villager who for greater safety had settled himself in a village or township, under some agreement, etc., and had from necessity cultivated a piece of ground adjoining his village, in common with the other villagers, is allowed the like quantity of land, as is before allowed to the actual settler; but it is land to which no other person has by the act a right of pre-emption. And to prevent doubts concerning settlements, the legislature has declared that no family shall be entitled to the allowance granted to settlers, unless they had made a crop of corn in the country, and resided in it at least one year, since the time of their settlement.

It appears to me that there is a very important difference, in the nature of the allowances granted to the different kinds of these settlers which makes it impossible that the legislature should have intended by the declaratory clause, to refer the services therein mentioned to each kind of settler indifferently. And if that is impossible without confounding claims which are essentially different, it remains to be considered, in what manner the different parts of the declaratory clause are to be applied to the different kinds of settlers.

If raising a crop of corn is to be applied as the counsel for the complainant contend, to the actual settler, how has it happened

that the commissioners have granted certificates to persons for raising corn in the country, who never made or claimed actual settlements, and in whose certificates no services but that of raising corn is expressed?

How has it happened too, that raising a crop of corn only, has been universally considered from the sitting of the commissioners to the present day as giving no other than a village right? If raising a crop of corn in the country will entitle a man to either an actual settlement or village right at his option, it is destroying the distinction the law has made between the two rights, and putting them upon an equal footing, which the legislature never intended. The law says, that 400 acres of land shall be allowed the actual settler to include his settlement, and that the like quantity of land shall be allowed the villager to which no other person hath the right of pre-emption, thereby making the pre-emption dependent upon the actual settlement, superior to the settlement right of the villager; a distinction which the actual settler will think well worth preserving.

If raising a crop of corn in the country, is to be applied to the actual settler, then it is clear that all decisions given by the court in this country, where village claims were contested, have been given upon improper principles, because in all such contests, the right of the party arising from his having raised a crop of corn in the country has been universally determined a village right, and no other. Again, if raising a crop of corn should be applied to the villager, as it has uniformly been, and residing one year in the country without having performed any service mentioned in the law, would also entitle a man to a village right, the actual settler who seems to have been one of the first objects of the legislature's attention, is altogether excluded, for the latter part of the declaratory clause can not give both an actual settlement and a village right, for the reasons already given, that it would be confounding the two claims, and putting them upon an equal footing, when the legislature has made a clear and an important distinction between them. But if raising a crop of corn is applied to the villager, and one year's residence to the actual settler (however ungrammatical this may be), the declaratory clause will then embrace no other description of persons, than the enacting parts of the law. All the decisions on those rights will have been given on proper principles, and I am of opinion the intention of the legislature will have been fully complied with.

McConnell *v.* Kenton.

The complainant's certificate states that he is entitled, for improving the land and residing in the country ever since the year 1775. It is universally conceded that improving land where there was no actual settlement made, though a proper and legal foundation for a pre-emption, is not for a settlement; and I have endeavored to prove that residence alone, for a year, or any longer time, can not give a right to a settlement and pre-emption under the law, because if it could, it must be a village right; and as raising a crop of corn in the country has also, by universal consent, been considered as a village right, the consequence of such a construction must unavoidably be that the actual settler is either excluded by the declaratory clause, or that the same service which entitled a man to a village right, would also have entitled him to an actual settlement right, which, for the reasons before given, is so glaringly absurd that the legislature could never have intended it. But the counsel for the complainant contend that the commissioners have put such a construction upon the law, and that all the world is bound by it. To prove this, the *cotemporanea expositio* is resorted to. *Cotemporanea expositio est fortissima in lege*, says the maxim, agreeably to which it has become a settled rule, in the construction of statutes, that great regard ought, in construing a statute, to be paid to the construction which the sages of the law, who lived about the time, or soon after it was made, put upon it, because they were best able to judge of the intention of the makers.

To make the application of this rule proper, four things must concur.

*First.* That the commissioners were uniform in their construction.

*Second.* That the expressions in the declaratory clause are doubtful.

*Third.* That we live at a period so remote from the passage of the law that we are not able to judge of the intention of the makers; and

*Fourth.* That the commissioners were such sages of the law that their construction may with safety be resorted to, and with certainty relied on.

All those things are necessary to the proper application of the before mentioned rule of construction; and as none of them exist in the present case, the rule must be inapplicable.

It is further contended that we are precluded from putting any construction upon this explanatory clause in the act of assembly,

and to prove this the counsel quotes as a maxim, "That statutes of explanation shall be construed according to the strict words, and not according to intendment." 19 Vin. 517, Ca. 62. Those are first principles of a science which are indisputable in themselves, and to the self-evidence of which the mind at once yields assent Is this so? Certainly it is not. Because it is impossible that the legislature can so word a law that no unforeseen case shall occur in which their expressions will not be at variance with their intention.

It is not, therefore, a first principle; it is not a self-evident proposition; neither has it received that uniform assent which is always given to the maxims of any science by its professors; so far from this, it has been repeatedly denied. This appears from the note of a number of cases on the same page of Viner, cited above; and in one of those cases, Hobart Ch. Just., denied that statutes of explanation should always be taken literally, for it is impossible that an act of parliament should provide for every inconvenience which happens. But there are still further reasons. It is contrary and inconsistent with several maxims which have never been doubted or contradicted.

"If divers statutes relate to the same thing, they ought to be all taken into consideration in construing any one of them." 4 Bac. 646, and the cases there cited.

Now, this maxim and what is contended for are contradictory in terms of meaning. Again, the intention of the makers of a statute ought to be regarded in the construction of the statute, although such construction seem contrary to the letter of the statute. 4 Bac. 647, 648. This also contradicts the principle laid down on behalf of the complainant. It is unnecessary to pursue those observations so particularly any farther. I will only add in general, that if the explanatory act be beneficial, or remedial, or in furtherance of justice, or concern the public good; in all such cases it must receive a liberal and equitable construction, even so much so as to restrict or enlarge the words so as best to promote the intent of the legislature with regard to the benefit, remedy, promotion of justice, or object of public good, in their contemplation. 4 Bac. 649, 651. Nor can a court be reasonably confined to mere grammatical expressions or weighing of syllables in the exposition of a law, except where that law is penal, and even then not to the strictness now contended for. I can not, therefore, admit the soundness of the rule cited for the complainant. But if this principle were

not contravened by reason, authority, and indisputable maxims, it will not apply to the act under consideration.

This is not an act passed separately and subsequently to a former act, which it is meant to explain. It is one single act, in which there are two sentences in different parts of it, on the construction of which the question arises. It is to be construed, then, by those maxims which really apply, and which are indispensable. One of these has already been cited, " That the intent of the legislature is to be considered." Another is, that in the construction of one part of a statute every other part ought to be taken into consideration. Co. Litt. 381. It is by these maxims I have been directed in the construction of this act of assembly. From thence, from the act itself, and from the cause of introducing the declaratory sentence, I formed the opinion which I formerly gave and still adhere to. To discover the intent of the legislature, the cause of making the statute ought to be considered. 4 Bac. 68. Now, the cause in the case under consideration arose from this circumstance. There were persons at that time in this country who had removed hither from motives by no means meritorious; persons who, I have been informed, were usually called *outlyers;* to exclude whom was the object of the declaratory sentence. And this is still more evident from the sentence itself. It is not, as has been argued, merely explanatory. It is restrictive.

The act provides that, to prevent doubts concerning settlements, it is hereby declared that no family shall be entitled to the allowance granted to settlers by this act, unless they have made a crop of corn in that country, and resided, etc. This is evidently meant not to explain and extend, but to limit and restrain the former expression in the act. No conclusion can be drawn from the argument that other occupations might be equally meritorious.

The evident intent to exclude even actual settlers, unless they had resided in the country at least one year after the time of their settlement, shows the clause or sentence to be restrictive, and that the legislature meant to confine their donation to the persons particularly described in the law; and it is further observed that this reasoning can not in any way affect the distinction between actual settlers and villagers, a distinction uniformly made by common opinion, the evident intention of the legislature, and all the judicial decisions in such cases.

The second error assigned is, that the certificate of the commis-

sioners ought to be considered as conclusive and final. Upon this error I refer to the reasoning upon the second question, stated in the decree of the court, and will make a few additional observations. It was admitted by the complainant's counsel, in their argument on the rehearing, that if the commissioners exceeded their jurisdiction, their sentence was a nullity, as if they had granted a man a certificate for a settlement and pre-emption for military service; and also that the court might set aside a certificate, though legal on the face of it, if fraudulently obtained, as in the case of *Briscoe* v. *Speed.*

From this admission I think it may be fairly concluded that the commissioners, in granting a certificate to the complainant for services not specified in the law, have as much exceeded their jurisdiction as if they had granted him a certificate for military service, and consequently that the jurisdiction of this court may as properly be exercised in setting the certificate aside in one case as in the other. Though the general principle is acknowledged to be right, yet, in the present case, it is said that the complainant having obtained the first certificate from the commissioners, and having, by his location, appropriated the land in contest, the defendant is precluded from contesting his certificate, though it should manifestly appear illegal.

It is said, too, that if any person had a vested right to land under the law, when a certificate was illegally obtained for the same land by another, that the person having the vested right would have the privilege of contesting the certificate. The law, I conceive, vested in every villager a right to 400 acres of land and the pre-emption of 1,000 acres adjoining it. This right I say was vested in every villager on the passage of the law for adjusting and settling the titles of claimers to unpatented lands, etc., and though he was not confined to a particular spot, like the actual settler, yet his right being vested, all that was necessary for him to do was to satisfy the commissioners that he was entitled to the benefit of the law, and then to designate the particular spot he chose by his location; this was one step among many others which the law required to perfect his title. As then he undoubtedly had a vested right, immediately after the passage of the law, every certificate granted by the commissioners to persons not entitled under the law, must operate to the injury of the legal claimant, because it was taking so much of the unappropriated land, in which he had a vested right, and giving it to those who, under the law, had

no right at all. The legislature, in restricting the villager to unappropriated lands, could never have contemplated that restriction as extending to lands which had been fraudulently or illegally appropriated; inasmuch, therefore, as the legal claimant has paid his money to the commonwealth, has complied with all the requisitions of the law, and has obtained a fair, just, and honest title, reason, justice, and equity, all declare that the legal claimant shall be preferred to the illegal one, whether he obtained the first or last certificate, for no grant of a certificate by the commissioners to a person not entitled by law, no subsequent ratification of the commonwealth, can sanctify a fraud practiced on a man having a vested right under the law at the commencement of the fraud.

For the reasons which I have now given, and for those contained in the former decree of the court, I am clearly of opinion that the complainant's certificate is illegal upon the face of it.

The state of the case, then, is concisely this: The complainant obtained from the commissioners a certificate of his right to a settlement and pre-emption for services which, under the law, did not entitle him. The defendant also obtained from the commissioners a certificate of his right to a settlement and pre-emption, for services which did entitle him. Both complainant and defendant claim the same land; the complainant having obtained the first certificate and the defendant the elder patent, and consequently holding a clear right at common law. In this situation the complainant applies to a court of chancery to compel the defendant to convey him his legal title to the land in contest. And this brings me to the third head of the former decree, to which I shall add but very little. The counsel for the complainant have contended that the commissioners were a court of special but unlimited jurisdiction, and have likened their certificates to the decrees of the spiritual courts, etc. There appears to be a considerable difference between the constitution of the court of commissioners and those courts to which it has been likened. But I am not investigating this subject, it being clear, from the authorities cited by the complainant's counsel, that if their position were right, yet still this bill ought to be dismissed. The case of *Nelson* v. *Oldham*, in 2 Vern. 76, is expressly in point.

The chancellor in that case says that a will gained by restraint and force on the party, being proved in the spiritual court, that matter was not to be controverted in equity; the plaintiff might make the best she could of her probate there, but should have no

aid from chancery, and therefore dismissed the bill. Therefore, on the whole I am of opinion, that the former decree of the court ought to stand confirmed and unaltered.

A rehearing was prayed by the attorneys for the defendants, who gave the following certificate of errors:

*First.* That the decree, after stating that the complainant was bound by the alteration made in his location with the surveyor, declares that he was at liberty to disregard the call made in his entry with the surveyor for Douglass' line.

*Second.* That the decree is founded in part on the supposed weakness of the defendant's claim to that part of the land, whereas the complainant ought to recover by the strength of his own claim, or the defendant's legal title remain unimpeached.

*Third.* That it is inconsistent to suppose that the complainant was mistaken in the true situation of Douglass' line, which makes one of the calls of his own entry.

*Fourth.* That the complainant ought to have been compelled to survey so as to adjoin Douglass' line.

*Fifth.* That the decree goes upon a mistake in a material fact, that "from the surveyor's report it farther appears, that should the complainant's survey be made more strictly conformably to the calls of his entry, it would still include the same land, so far as the defendants are interested, which he has surveyed;" whereas, the fact is that if he had surveyed in that manner, his claim would not have covered a part of the land to which the defendants, and particularly the defendant Keene, now has the legal title.

*Sixth.* That the decree has declared that the complainant's claim is surveyed properly; whereas, even if the call for Douglass' line was to be rejected, his claim has been surveyed contrary to law.

And the court directed the said cause to be reheard at the next term.

But before the same was argued the original jurisdiction of the court of appeals was taken away, and the cause was sent to the district court, held in Lexington, to be tried on the said certificate of errors.

It was tried at the said district court, at the ——— term, in the year 1798, but no alteration made in the decree.

And from the decree of the district court the defendants prayed and obtained an appeal.

The appeal was argued at the ——— term, in the year 179 .

NICHOLAS for the defendants.—From the particular situation of

this cause, little argument had been had on the points now to be submitted to the court.

McConnell has the legal estate in him; Kenton has an inferior legal estate, and a superior equity, as the court say, to part of this land; but he can recover none of it unless he can show both a legal and an equitable right to that part, because until he does this, McConnell's elder legal right will be sufficient to protect him; and however weak McConnell's claim may be, Kenton must recover on his own strength, not on McConnell's weakness.

Both decrees have given Kenton all the land he claims, which interferes with McConnell, and these decrees have asserted that Kenton has surveyed exactly right; to ascertain whether he has actually done so, it will be necessary to inquire:

*First.* How he ought to have surveyed under his certificate with the commissioners?

*Second.* How under his entry with the surveyor? And

*Third.* To apply the doctrine arising from these inquiries to the decrees under consideration.

*First.* How ought Kenton to have surved under his certificate with the commissioners?

It has three calls in it:

*First.* To lie on Elkhorn.

*Second.* To adjoin Preston's survey on the south-west side; and

*Third.* To include his improvement.

The first call (to lie on Elkhorn) must be rejected, because it is altogether repugnant to and inconsistent with the others, and therefore can not be complied with.

The second, to adjoin Preston's survey on the south-west side.

Preston has a survey there, and that survey is adjoined on the the south-west side, and that survey was on record, a copy of which record was then before the commissioners, showing its quantity, its figure, and the length of its lines. How, then, ought he to adjoin the south-west side of this survey, in part, or the whole length of it?

Not in part, because it would be impossible to say, from the location, what that part of it ought to be; and because it would be contrary to the express words of the location, which calls to lie on the south-west side of the survey, which must mean the whole length of that side of the survey.

The reason of this is so plain and obvious that it is sufficient to state it without enlarging on it. The general consent of all per-

sons interested in land disputes has fixed it as an undeniable principle that where a location calls to adjoin a line, or a side of a survey, without pointing out any particular part of it, that it must join the whole length of that line or side.

The decisions of our courts on this subject have been numberless, also; and the decision given by the court of appeals in Virginia, in the appeal *Briscoe* v. *Swearingem*, fully establishes the principle that when you call to lie on a particular line or side of a survey, that you must occupy the whole of that side, and are not at liberty to extend your survey further than the course of the line called for, or to abridge the length of that line in your survey.

This is the general rule respecting the joining the side or line of a survey called for, but like every other general rule, it has its exceptions; but those exceptions, instead of weakening, strengthen and prove the rule. One of these exceptions is, where the side or line of the survey is so long that you can not join the whole length of it with your entry; in that case, rather than destroy the claim altogether, the court would place it in a reasonable manner on a part of the line, or by putting it at equal distances from the ends of that line; but as this would be contrary to the words of the location, it ought never to be done but from necessity, and when the side or line is so long that it can not be joined its whole length.

This survey of Preston's, which Kenton calls for, was on record; that record was on the commissioners' table when the certificate was granted; that survey was for 1,000 acres, and the line and side of that survey which is called for, is by that record 440 poles long : this line when applied to a survey of 400 acres would give a figure of 440 poles by 145½, not three times as long as wide.

So far then from its being impossible to join Preston's survey the whole length of the south-west side, it may be done with convenience ; it will leave Kenton 400 acres in a very reasonable and good form ; and therefore there was no reason to say that in this case the general rule should not be complied with, by making them join the whole length of that side of the survey.

Third call, to include his improvement.

In considering this call it will be proper :

*First.* To establish whether Kenton had any improvement on this land, and which is Kenton's improvement. And

*Second.* To point out the legal consequences of that call, from the relative situation of that improvement to Preston's south-west side.

*First.* Where was Kenton's improvement?

The certificate is to include his improvement; the entry with the surveyor does not call to include it; the bill does not state that Kenton had made any improvement on the ground, or the situation of any improvement claimed by him; and the decree does not state that it was proved that Kenton had any improvement on the ground; neither does the decree say that his mode of surveying is justified by the situation of his improvement, but is silent upon the subject of the improvement altogether.

As therefore this cause came before the court of appeals under its original jurisdiction; as the matter of fact was submitted to the court, and the trial by jury waived by consent of the parties, the decree not mentioning the fact of Kenton's having an improvement as being proved, it shall be considered as not having been proved at all. 2 Com. 318; 1 Vern. 214.

And this is more particularly right under our constitution, which says that the court shall " on the conclusion of every cause, state on the record the whole merits of the cause, the questions arising therefrom, the opinion of the court thereupon, and a summary of the reasons of the court in support of those opinions."

I have therefore a right to conclude, that as the decree does not state it as a fact proved to the satisfaction of the court, that Kenton had an improvement on this land, that it was not proved to their satisfaction that he had, that as the decree does not justify his mode of surveying at all from the situation of any improvement claimed by him, that the existence or situation of such improvement, had no influence in the making of the decree, and ought to have no weight in the rehearing of that decree.

But admitting for argument's sake, that it is now proper and necessary, notwithstanding the silence of the decree on the subject, to ascertain the real situation of the improvement; it can only be done by resorting to the exhibits and proofs in the cause.

Three improvements are laid down on the connected plat. No. 1 called the Blue spring. 2, Lyon's spring, and 3, Keene's spring; and the surveyor in the report says he laid down by the direction of Kenton, Lyon's spring at 2, and by direction of the defendant, the Blue spring at 1, and Keene's spring at 3; and from a recurrence to the testimony, it will appear that Kenton brought forward the testimony of Samuel Johnston and William Stevenson, to show that he made some improvement December, 1779, and February, 1780, at Lyon's spring at 2.

McConnell v. Kenton.

I am therefore authorized in saying, that if Kenton had any improvement on the ground it was at Lyon's spring at 2.

This will bring me to consider,

*Second.* The legal consequences the call to include this improvement must have, when its relative situation as to the south-west side of Preston's survey is taken into consideration.

There are many different ways in which an improvement called for in a location, may be included in a survey; and the most proper way of doing it must be settled by the other parts of the location; if the call to include the improvement is accompanied with no other call which explains or restricts this call, the survey should be made in a square, with the lines running to the cardinal points, and the improvement in the center of that square; where the call is to include the improvement and to run a particular course for quantity, the survey ought to be in a square with the improvement in the center of the boundary opposite to the course called for, and the improvement to be barely included in the survey. See the case *Miller's heirs* v. *Fox's heirs, ante,* p. 100.

Where an entry calls for a dividing line, and another entry or survey, and also to include an improvement, it is proper to consider that dividing line as established, and to run from the whole length of that line, so as to include the land as nearly as can be in a square, and also to include the improvement; but it is not necessary that the improvement shall in that case be in the center.

This last is exactly Kenton's case; Kenton calls to adjoin a fixed and established line, and also to include his improvement, and as the improvement is so situated, that he may adjoin that line and also include the improvement by running at right angles from the course of that line for his quantity; he ought to have surveyed in that manner, and it is immaterial in what part of the survey, the mode of surveying would have placed the improvement.

And as this line of Preston's was of such a length as would admit of its being joined by Kenton from end to end, and also include his improvement in his survey; the calls to include his improvement did (from the situation of his improvement) make no change whatever in the location with the commissioners, as it would have stood without this call.

But admitting that Preston's line had been so long that he could not have adjoined it, and also have included his improvement, he ought then to have surveyed in a square to adjoin that line, and

running at right angles from the course of it, including the improvement in the center between the eastern and western boundaries. See the case of *Sinclair* v. *Singleton*, *ante*, p. 176.

How ought Kenton to have surveyed under his entry with the surveyor ?

" Simon Kenton enters 400 acres by virtue of a certificate, etc., lying on Elkhorn in the corner between Preston's survey at the Cave spring and Douglass' line."

The court in their decree say, " the words in the entry in the corner between Col. Preston's survey and Douglass' line contain an explanation of his location with the commissioners, which is a material addition thereto, and ought to be considered as having the same effects as an amendment to any other location : the owner is bound by it, and all subsequent locators."

This part of the decree contains two propositions.

*First.* That the entry makes a material alteration in the location with the commissioners.   And

*Second.* That Kenton is bound by that alteration.

It will be necessary therefore, to ascertain the true meaning of the entry, and to ascertain how far that alteration does extend.

In doing this we should still bear in memory that by the location with the commissioners, Kenton ought to have adjoined the whole length of Preston's line.

*First.* What then was the object of the amendment ?   Was it to carry his land further north ?   No, he was bounded by Preston on that side.

Was it to go farther west ? It was not; because the corner and the line called for, were to the east.   Was it to go farther south ? No, because he was bounded to the north by Preston, if the alteration made in the survey was to carry him further east, it must necessarily lessen the distance to the south.

Besides the objects called for were in the east, and therefore the intention of the entry, if it made any alteration in the location, must have been to extend Kenton's land further east.

The court admit in their decree, Kenton's entry with the surveyor, where it calls to be in the corner between Col. Preston's survey and Douglass' line, contains an explanation of his location with the commissioners, which is a material addition thereto, and ought to be considered as binding on Kenton as an amendment to his location.

It will be necessary then to consider the amendment.

*First.* What was the intention of the location. And

*Second.* How far that intention can and ought to be complied with.

Kenton by his location with the commissioners had called "to join Col. Preston's survey on the south-west side." By his entry with the surveyor, he called "to lie in the corner between Preston's survey and Douglass' line."

In what does the material change and addition consist, which is made by this location with the surveyor? He is still to join Preston, but he is also to join Douglass' line, so that the adjoining of Douglass' line is the change which is made in the location by the entry with the surveyor, and the adjoining of that line is the object, the end of the location. The corner is only a description, or means used to carry them to that end. Such a construction ought to be put on the entry as will best effectuate the intention of the entry, but in this nor in any other case ought the end to be sacrificed to the means; and the great and manifest object being to join Douglass' as well as Preston's lines, it ought to be complied with, although they do not intersect, so as to form what is strictly speaking a corner; and if this is the true construction of the location, the court have said that it is binding on Kenton; but Kenton has not gone any nearer to Douglass' line than Preston's corner, and yet the court say that Kenton has surveyed properly.

To determine whether he has or not I will

*First.* Examine the reasons given by the court, and show that they are not well founded. And

*Second.* Prove that admitting all the reasons to be good, the inference drawn from them "that the survey is legally made," is not a proper or a legal one.

*First.* I will examine the reasons of the court.

"The only doubt arises from his not having adjoined Douglass' line, but as he calls for the corner between Col. Preston's survey and Douglass' line, and it appearing that Preston's survey was on record, and that there was no record of Douglass' line, but only that there was a line known to many persons by that name.

"It seems evident, that the complainant supposed Douglass' line run off from the corner of Preston's survey, and in that way formed a corner in which he was mistaken.

"Therefore the court is of opinion, that if the complainant had extended his survey further toward Douglass' line than the corner

of Preston's survey, that it would have been contrary to the apparent intention of his entry; and from the surveyor's report it further appears that should the complainant's survey be made more strictly conformable to the other calls of his entry, it would still include the same land so far as the defendants are interested, which he has surveyed."

The first part of the reasoning is not just, and the court are mistaken in point of fact.

Ward's survey, so called on the plat, was called Douglass', because it ran by him and was to be found on the same record with Preston's.

They were both before the commissioners, and Kenton must have been particularly well acquainted with it, for he not only knew whose survey it was, but by whom it was made, and speaking of the two you may observe the difference of expression, *Preston's survey* and *Douglass' line*, that is a line made by him.

That the line was known to many persons as Douglass' line was sufficient; a name gained by reputation will answer as well as a call, as the true name, but if not sufficient against all the world, it must be binding on him who uses it.

Kenton, by calling for this line, must be considered as having full notice of every thing relating to it.

He who calls for a deed has notice of the contents of it, nay farther, he has notice of the contents of a deed referred to by the deed he does call for.

I do not see how it is evident that Kenton supposed Douglass' line did run off from the corner of Preston's survey.

The entry calls to lie in the corner made by, or to lie between the claims. The corners of the two are opposite, why then is it evident, as the court say, that Kenton supposed that Douglass' line run from Preston's corner, any more than that Preston's run off from Ward's corner?

But the court also say Kenton was mistaken. If he was, it was his own blunder, and in the description of his own entry.

The substantial call of the entry was for Douglass' line: the corner, the form or manner only, let the corner be rejected and let him adjoin Preston and Douglass.

If it was necessary the court would supply a line from Preston's to Douglass' corner to effectuate the manifest intention of the entry to join Douglass' line.

See the case of *Smith* v. *May and Curd.*[1]

In that case there was an interval and no eastwardly line to the creek. Here the lines do not intersect. There Smith was allowed to run to the creek without such a line of Williams' as was called for, because it was his obvious intention to go to the creek, and there the court rejected the call for Williams' east line and supplied a line not called for.

So here he should go to Douglass' line, although it does not intersect, because it was his obvious intention to lie on that line. There is no more rejected, or supplied, here than there.

If the joining Douglass' line was the real object of the entry, Kenton destroys his own claim if he proves it can not be done, because it is the call of his entry, and he is complainant in chancery against a legal title. But the fact is, that it may be done and the survey made in a very good form, as it is only 351½ poles from Kenton's improvement, at Lyon's spring, to that part of Douglass' line, which is opposite to it.

Again, the court say that the entry with the surveyor has made a material change in the location with the commissioners. If this is so, Kenton must have known that Douglass' and Preston's lines did not intersect, because if they did, there was no change in the location with the commissioners, as by it he was to join Preston the whole length of his line, and in doing so he must also join Douglass.

And, supposing Kenton to be informed of the true situation of Douglass (which ought to be supposed), then his entry with the surveyor may have its spirit fully complied with by joining both claims, although they do not, technically speaking, make a corner; and the technical phrase must always give way to the real intent even in deeds, much more so in entries. Kenton ought, therefore, to have gone to Douglass' line, and not have stopped at Preston's corner.

It is impossible that, if he had surveyed strictly conformably to entry, that he would cover the same land.

Because, as the surveying more strictly agreeably to location would extend the survey further east or west, or both east and

---

[1] In the case of *Smith* v. *May and Curd* an interlocutory judgment was given in the court of appeals, and then removed to the district court held in Bardstown, and from thence to the general court. The judgment being opened and a new trial granted the plaintiff dismissed his caveat.

west, it would necessarily curtail it to the south, and therefore, if altered either way, it would not cover the same land.

But if the decree meant that it would cover the same quantity of land that it now does of what is held by the defendant, the decree is unquestionably erroneous.

*First.* Upon general principles.

*Second.* Upon the particular circumstances of the cases.

*First.* Upon general principles.

Both Kenton's and McConnell's claims are patented.

McConnell has the eldest patent, and Kenton is complainant in chancery.

Therefore, let Kenton's equitable right be what it may, he is now precluded from claiming any land that is not included in his patent, and, of consequence, if he had left out of his patent 100 acres of land, held by McConnell's elder patent, to which Kenton had a superior equitable right, and had included only 10 acres, to which he had no equitable right, and McConnell had only a legal right, Kenton could not recover either the 100 acres or the 10, and he could not balance his want of equity to the 10 by his original equitable claim to the 100, because he had given up his equitable claim to the 100 by excluding it from his patent, and by including in his patent the whole quantity to which he was entitled without, and independent of that 100 acres.

This doctrine is right.

*First.* Upon general principles of equity; and,

*Second.* Upon the particular circumstances of the case.

*First.* Upon general principles.

No complainant can recover against a legal title any thing to which he has not a superior title; each acre should be considered as a distinct tract, and he can no more recover one acre to which he has not an equitable title, than he could have recovered at all, if he had had no equitable title to any part of the land.

From this maxim, that no man shall be admitted to take advantage of his own wrong; now if there is no other claim to that part of the land which is out of McConnell's claim, and which Kenton has included in his patent contrary to location; Kenton's claim to that land would be good against the commonwealth, whereas he may have given way as to the 100 acres by his manner of surveying to a better claim; and then he would by his erroneous manner of surveying, not only get other land, but also more land than he was entitled to by his location; and in either case it would be allowing him to receive a benefit from his own wrong.

Therefore it would be wrong, independent of the injury to the defendant.

But it would, also, be injurious to the defendant on general principles, if the court should decree to Kenton the 10 acres to which he had no equitable claim, because he once had an equitable claim to the 100, which claim he has since relinquished. McConnell might hereafter have the 100 acres also taken from him by a third claim, and then he would lose both the 10 and the 100; therefore, upon general principles, Kenton can not recover any one foot of the land, unless it is. included in his patent, and unless he also has superior equitable claim on it to that of McConnell's.

But it would also be wrong to make such a decree in Kenton's favor.

*Second.* Under the peculiar circumstances of this case.

There are two defendants in this case.

McConnell. the original patentee, Keene the purchaser from him; they hold by distinct moieties; Kenton recovers against McConnell, because his claim was superior in point of equity to his; and of Keene, because he had notice of his claim before he purchased of McConnell; but if he takes from either of them more land, or other land than he has a real equitable claim to, injustice will be done to one or both of the defendants, even if upon the whole Kenton gets no more land than he was really entitled to f, om both; if he takes too much from McConnell, he would lose land instead of being answerable to Keene for damages under his warranty only. And he might lose a particular part of the land to which his title was good, where it was from quality or other circumstances more valuable than any other part of the land.

If he takes too much from Keene, the injury might be much greater; his legal title ought to give way only to the real equitable title of Kenton, of which he had notice. Take more from him, and he is not only deprived of his land to which he has a right, but is turned over to McConnell for damages, which from the nature of his warranty may not be equal to the value of his land; but also for damages which McConnell may not be able to pay.

Besides if the defendants, or either of them, hold black acre and white acre, and Kenton is entitled to black acre, the court can no more from an idea of equality in value decree white acre to him than they could decree to him both black acre and white acre, if he had no claim to either; the sacredness of the rights of property,

McConnell *v.* Kenton.

and the want of legal power in the court would equally forbid it. I am therefore warranted in saying that this part of the decree must be erroneous.

I will now,

*Second.* Show that admitting all the reasons assigned by the court to be just, that Kenton has not surveyed properly; and therefore that the decree saying which part of the land he shall recover is improper.

I have already proved that Kenton ought to have joined Preston's survey the whole length of it; but I will now admit for argument's sake that he ought not to have done this, because of the length of that line ; and it will still be evident that his claim is surveyed wrong.

The manner of surveying an entry not special in itself, must be determined by some general rule; it is to be done under the legal discretion of this court, but the court can not arbitrarily depart from the general rules laid down for the construction of such entries any more than they can depart from the special calls of the most special entry.

If this doctrine be right, I ask by what general rule it is, that Kenton's present mode of surveying can be justified ; say that he shall begin at Preston's south-east corner, and that he shall not go the whole length of his line; and he ought then only to include the improvement at Lyon's spring, because that would be nearest a square. See the case of *Miller's Heirs* v. *Fox's Heirs, ante,* p. 100.

Say (as the fact is), that he was no more confined to the south-east than to the south-west corner, and that the side was too long to join the whole, and then he ought to have surveyed in a square with the improvement in the center, between the east and west boundaries. See the case of *Sinclair* v. *Singleton, ante,* p. 176.

But the present mode of surveying can be justified by no rule that I ever heard of.

But admitting that the manner of surveying is right, how can the decree be justified which gives Kenton all the land contained in his survey, when there is 18 acres too much in it, and he is complainant in chancery?

And Kenton also has 1,133 acres instead of 1,000 in his patent.

BRECKENRIDGE for the appellee.—If Kenton ought to have surveyed, as is contended on the other side, he would have lain at the end of Preston and not on his side.

I can not see any error in the decree.

. Kenton by his certificate called for Preston, and declared his intention of lying to the south-west of Preston's survey; when he makes his entry with the surveyor, he explains what part of Preston's line he means to adjoin by calling for the corner.

If there had been a corner formed by Douglass' line, running off from Preston's corner a southwardly course, there would have been no doubt that Kenton should have surveyed as he has done; there being no corner, Kenton was evidently mistaken, but the call is notwithstanding sufficient evidence that he intended to take the land south-west of Preston, and to adjoin on his south-west line to his southwardly corner.

If you are to give operation to every part of Kenton's entry, you can not make him adjoin Ward's or Douglass' line, for in that case a great part of his claim would not, according to the call, adjoin Preston on the south-west side.

BY THE COURT.—This being an appeal from a decree of the district court held at Lexington, pronounced in affirmance of a former decree of the court of appeals, and on consideration of errors assigned on behalf of McConnell and Keene; it only appears necessary and proper to examine whether the errors alleged do or do not militate against the last mentioned decree.

As to the first error, there can be no reason why a vague or impossible call in the alteration of a location should not be disregarded more than in an original entry. In either case it ought only to be done from necessity, and then it is warranted by established precedents and the soundest principles of justice.

The import of the second error is hard to be comprehended. This court formerly adjudged that McConnell first acquired a title to the land in contest, subsequent to Kenton's location with the commissioners and his entry with the surveyor, which taken together included the same land; and it still seems that a comparison of the ages of these claims was indispensable, and that the result is justified by the proofs exhibited at the trial of the cause.

So that the court does not see that the decree in any part is founded on the weakness of McConnell's title to the land, further than as Kenton's title was found to be superior to it in point of age.

As to the third error, when a call in an entry or location is rejected on account of its being incompatible with other calls therein, it must always be presumed that the locator was mistaken; and to determine in which call he was mistaken is the only task, which generally is not difficult.

On the fourth error, the court would observe that Kenton located his settlement with the commissioners to adjoin a survey of Col. Preston's on the south-west side and to include his improvement, and he enters it with the surveyor, to lie in the corner between Preston's said survey, and Douglass' line.

And conformably to the decision in the late supreme court, in the suit of *Consilla* v. *Briscoe* (*ante*, p. 84), these locations should be taken as one or to be made to explain each other.

Then Kenton's settlement is to adjoin Preston's survey on the south-west side to include his improvement; and to lie in the corner between Preston's survey and Douglass' line; from which it is evident that Kenton supposed when he made his entry with the surveyor, that Douglass' line so extended from Preston's survey as to form therewith a corner, or an angle. But in this he was mistaken, and therefore the call for Douglass' line ought to be rejected.

Moreover, it being found that Douglass' line is a considerable distance to the south-east from Preston's survey, and can not be regarded (further than to ascertain what part of Preston's survey Kenton meant to adjoin) without contravening two other of his calls, to-wit: to adjoin Preston on the south-west side, and to lie in the corner, etc., and for this reason it seems to the court rational that he should begin at the south-east end of Preston's south-west line, that is to say at the south corner, this being as near Douglass' line as those other calls last mentioned would permit him to approach it.

To judge of the force of the fifth error, Kenton's locations must be further investigated. The decree of the court does not expressly state that the improvement called for in Kenton's location with the commissioners was ascertained; but all the calls in his entries being alluded to, so much is certainly implied, and the court was formerly and is now of opinion, that both the identity and notoriety of his improvement at Lyon's spring were established by sufficient proofs.

The same proof must now be regarded to attain justice, which seems to be authorized by the case of *Bonham* v. *Newcomb*, Vern. 216, not to say that some of the errors under consideration were intended to be collected from proofs not stated in the decree.

Then from the adjudication of the late supreme court in the case of *Smith* v. *Grimes* (*ante*, p. 35), and from a principle which

21

that court and the court of appeals have generally regarded, viz: that all surveys should be square when a compliance with the entries on which they are founded do not necessarily require them to be otherwise. Kenton's survey on his location with the commissioners ought to have been a square (unless the distance of his improvement from Preston's survey had made it necessary to extend it further), and have so adjoined Preston's survey as that the lines at right angles thereto, would be at equal distances from the improvement. But agreeably to Kenton's entry with the surveyor, and his location with the commissioners taken as one entry, and rejecting the call for Douglass' line, his survey should begin at Preston's south corner, and extend along that survey northwestwardly so far, that a line at right angles thereto would just include the said improvement, if so doing would stretch the survey beyond a square, which happens to be the case.

After the foregoing observations, any observation on the sixth error would be superfluous.

The opinion of the court remaining unaltered as to the manner in which the appellee ought to have surveyed his settlement, and as to its superiority to that of the appellants; it still appears certain from an inspection of the surveyor's report exhibited in this cause that the said survey would include all the land in contest; and therefore the appellants have not been injured by the manner in which the appellee has surveyed; and it may not be improper to add, that if the appellee's improvement had been fixed at the Blue spring, as was attempted, it would have produced no change in favor of the appellants. Or if it should be conceded that the appellee has not shown the improvement he calls for, his settlement being a village right, to which an improvement is not essential; that call also ought so be rejected, and his other compatible calls only regarded.

Then beginning at the south corner of Preston's survey, he should only have run so far with his south-west line as to make his settlement a square; and in this way likewise it appears the survey would include all the land in contest.

Whereupon, it is decreed and ordered, that the said former decrees of this court, and the said decree of the district court in this cause pronounced, do stand confirmed and unaltered. With costs, etc.